UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JEFFREY A. WILLY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:18-cv-03934-RLY-DML |
| | ) | |
| ELI LILLY AND COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**BRIEF IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

Plaintiff Jeffrey Willy enjoyed a successful 12-year career at Defendant Eli Lilly and

Company ("Lilly").  He transitioned from contractor to full-time employee, received tuition

reimbursement for both his master's and doctorate degrees, and was promoted three times.  He

never was disciplined, demoted, or discharged.  Instead, he was fast-tracked.  In the last two

years of his employment, he was promoted twice, including one double promotion.

The pace of Willy's career progression was nearly unprecedented, and it proved difficult

for him to sustain solid performance as his responsibilities rapidly increased.  His supervisor,

who had been his staunch supporter, invested in him, though.  She met with him regularly,

supported his attendance at conferences, and provided him with constructive feedback.

However, after many months, she shared with Willy that his performance was trending toward

not meeting expectations.  Rather than accepting accountability, Willy began looking for work

elsewhere.  Just two months into his job search, he had accepted a more lucrative job offer from

a competitor, although he waited more than two months before giving Lilly notice of his

US.130079423.10

resignation so that he could receive credit as an author on a manuscript. Ultimately, Willy resigned effective September 7, 2018.

Despite the support and success he found at Lilly, Willy – who identifies as a gay man – accuses Lilly of constructively discharging him, discriminating against him based on his sex, and retaliating against him for reporting it. Willy's constructive discharge claim is barred by his failure to exhaust administrative remedies, and the conduct he claims to have experienced falls far short of an actionable hostile work environment, much less a constructive discharge. His discrimination and retaliation claims further fail primarily because he suffered no adverse action. For all these reasons, and more, Lilly is entitled to summary judgment on Willy's claims.

## II.    STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

### A.    Lilly Prohibits Discrimination, Harassment, And Retaliation.

Lilly is a global, research-based pharmaceutical corporation that develops, manufactures, and sells pharmaceutical products. [Declaration of Bernice Anthony ("Anthony Decl.") ¶ 2.] Lilly's Conduct in the Workplace Policy, published in its U.S. Employee Handbook (the "Handbook") and reiterated in The Red Book, sets forth its commitment to equal employment opportunity and a workplace free of discrimination and harassment, including based on sex and sexual orientation, and retaliation. [Anthony Decl. ¶¶ 4-5; Anthony Decl. Exs. A, B; Deposition of Jeffrey A. Willy ("Willy Dep.") 23:23-24:1, 24:6-15.] It also describes multiple avenues for reporting conduct believed to violate them. [Anthony Decl. ¶ 4; Anthony Decl. Ex. A; Willy Dep. 24:2-5.] Specifically, employees may report concerns to their supervisor, human resources, ethics and compliance, or a toll-free hotline. [Anthony Decl. ¶ 4; Anthony Decl. Ex. A.] Lilly provides annual training to all employees on the Conduct in the Workplace Policy. [Willy Dep.24:16-18.]

2

**B.** **Lilly Hires Willy, Reimburses His Tuition For His Master's And Doctorate Degrees, And Promotes Him Three Times.**

Lilly hired Willy as a contractor on September 18, 2006, and as a fixed duration employee one year later.[1]  [Willy Dep. 15:24-16:1, 20:6-15.]  In that role, Willy reported directly to Thomas Baker.  [*Id.* 24:19-23.]  During this time, Willy began pursuing his master's degree, and with Baker's approval, Lilly reimbursed Willy for his tuition.  [*Id.* 71:8-72:10.]

In 2009, Lilly hired Willy as a full-time P1[2] Toxicologist.  [Willy Dep. 62:14-63:2; Willy Dep. Ex. 4).]  Willy supported Baker's lab and continued to report to him.  [Willy Dep. Ex. 4 at 1.]  In mid-2012, at Baker's recommendation, Lilly promoted Willy to a P2 Associate Toxicologist.  [Willy Dep. 76:22-77:4, 81:15-22.]  In summer 2012, Willy returned to school to obtain his Ph.D., while continuing to work for Lilly.  [*Id.* 76:18-21, 79:22-80:10; Willy Dep. Ex. 7 at 1.]  With Baker's approval, Lilly reimbursed Willy for tuition for the Ph.D. program, too. [Willy Dep. 80:16-81:11, 81:23-25.]

In 2016, Lilly rewarded Willy with a double promotion, from P2 to a P4.  [Declaration of Anja Stauber ("Stauber Decl.") ¶ 6.]  A double promotion within the P path is uncommon and nearly unprecedented.  [Willy Dep. 96:4-13; Deposition of Thomas Jones ("Jones Dep.") 49:1-20.]  Both Baker and Baker's supervisor, Anja Stauber, Director of Toxicology/Pathology, supported Willy's double-promotion.  [Stauber Decl. ¶¶ 4-6.]

In 2016, Stauber and others from Lilly attended Willy's thesis defense for his doctorate degree.  [Willy Dep. 13:7-15; Deposition of Anja Stauber ("Stauber Dep.") 102.20-103.8.]

---

[1] A fixed duration employee is an employee hired for a pre-defined length of time.  [Willy Dep. 21:15-22:2.]

[2] "P" stands for Professional and is the name of one of Lilly's salary paths.  [Stauber Decl. ¶ 3.] There are four levels in the P path: P1 through P4. [*Id.*]

3

Although Stauber cannot recall when she first learned of Willy's sexual orientation, she recalls being introduced to Willy's significant other at this event and knowing about Willy's sexual orientation before then. [Stauber Dep. 102:14-103:8.] Willy completed his Ph.D. in June 2016. [Willy Dep. 13:7-15, 96:13-17.]

Even though Willy had received a double promotion only months earlier, Stauber recommended Willy for yet another promotion, from P4 to R1 (Research Scientist). [Stauber Decl. ¶ 7; Willy Dep. 96:4-9, 99:2-5.] R path, or research path, positions are senior-level scientific jobs. [Stauber Decl. ¶ 3.] They are independent scientists, many of whom have doctorate degrees, who are responsible for leading projects, developing their own research consistent with business objectives, and sometimes managing their own labs. [*Id.*] There are eight levels in the R path: R1 through R8. [*Id.*] Willy was promoted to R1 (Research Scientist) on October 1, 2016, and began reporting directly to Stauber. [*Id.* ¶ 7; Willy Dep. 93:4-24.]

In connection with his promotion, Willy shared the same lab space with other R path scientists in Investigative Toxicology and was given support, including one direct report and one shared contractor. [Stauber Decl. ¶ 8; Stauber Dep. 22:13-19, 24:15-19; Willy Dep. 93:9-14, 105:18-24.] Stauber had no resources for more headcount for Willy. [Stauber Decl. ¶ 8.] Although the two others in Investigative Toxicology who reported to Stauber had more direct reports, they also had been lab leaders for more than a decade and already had developed tools and delivered capabilities need to support the larger Investigative Toxicology strategy. [Stauber Decl. ¶ 10; Stauber Dep. 24:20-25:9, 67:25-68:6.] Baker (who had been Willy's supervisor), was an R2 (Senior Research Scientist); and Laurent Malherbe was an R3 (Principle Research Scientist). [Stauber Decl. ¶ 9.]

US.130079423.10

### C.     <u>Willy Reports an "LGBT Slur" To Stauber.</u>

On January 31, 2017, Willy emailed Stauber: "An associate made an LGBT slur yesterday, to my face. Let's talk when you get a chance." [Willy Dep. 111:3-12; Willy Dep. Ex. 11.] Stauber quickly responded and invited Willy to stop by her office to discuss. [Willy Dep. 111:13-112:3.] Willy claims that he told Stauber that, while he was waiting to use the men's restroom, John Stutz, a technician who reported to Willy's peer, told him, "Well, just use the women's restroom. That's what all the weirdo transgenders are doing these days, or something to that extent." [*Id.* 112:4-113:3.] Willy claims that, in response, Stauber said, "Well, you're an R1 scientist now, you're in a management role, I want you to handle this."[3] [Willy Dep. 112:11-113:11.] Willy said, "okay." [*Id.* 114:10-12.] Willy does not know if the technician was aware of his sexual orientation; Willy never told him, though. [*Id.* 26:23-25, 69:25-70:4.]

### D.     <u>Willy Struggles With The Responsibilities Of A Research Scientist And Receives Coaching But No Discipline.</u>

In late 2016, Stauber had several conversations with Willy to help him understand his role as R path lab leader. [Stauber Dep. 61:24-62:25.] However, Willy struggled to rise to the responsibilities of his new role. [*Id.* 63:6-11).] Stauber also had several conversations with Willy after she received feedback from cross-functional colleagues who worked with Willy about his inability to meet commitments, and she documented those discussions in her check-in notes from their one-on-one meetings and in a year-end performance management document. [*Id.* 35:21-36:15; Willy Dep. 166:16-19; Willy Dep. Ex. 12 at 3.] Stauber nonetheless rated

---

[3] Although not relevant for purposes of Lilly's summary judgment motion, Stauber's recollection of this meeting differs: She reports that Willy never told her who made the "slur" and that, in response to her asking him how she could help, he said that "this is something that he wanted to handle on his own because he wanted to be a leader within the LGBT community" and "wanted to have a conversation with the individual." [Stauber Dep. 39:12-40:10.]

US.130079423.10

Willy's 2017 performance as meeting expectations. [Willy Dep. 166:16-19; Willy Dep. Ex. 12 at 3.]

Stauber did not recommend that Willy be awarded any equity (or stock in the company) for his 2017 performance, though. [Stauber Dep. 30:2-15, 86:3-8.] Lilly offers equity as a bonus, but only a percentage of employees in certain job classifications are eligible to receive it each year. [Stauber Dep. 30:2-25, 31:20-32:19).] For example, only 30 to 50 percent of P4 to R2 employees receive it, and decisions about whether and to whom to award equity are discretionary. [Stauber Dep. 31:20-32:19.] Stauber chose not to award equity to Willy because his 2017 performance as compared to the performance of his peers had not merited it. [Stauber Decl. ¶ 12.] He had struggled with his new responsibilities as reflected in Stauber's well-documented feedback to him. [Stauber Dep. 35:1-36:15, 63:6-17; Willy Dep. Ex. 12 at 3.] Stauber did, however, recommend Willy for a bonus and merit pay increase, and Willy received both effective March 2018. [Stauber Decl. ¶ 12.]

E. **Stauber Continues To Coach – But Not Discipline – Willy.**

Stauber's performance conversations with Willy continued in 2018. [Stauber Dep. 35:21-36:15.] In early 2018, Stauber met with Willy several times to discuss his objectives for the year and help him create a business plan. [*Id.* 97:13-25.] From Stauber's perspective, Willy struggled to develop objectives and a plan with sufficient specificity. [*Id.* 54:1-9, 97:13-25).] Although Willy's new role required him to exhibit independence and the ability to execute strategically rather than being told what to do, Stauber offered suggestions for improvement. [*Id.* 100:22-101:20.]

F. **Willy Reports Concerns to Human Resources, And Lilly Investigates Them.**

On March 30, 2018, Willy called Human Resources and reported various concerns. [Anthony Decl. ¶ 6; Anthony Decl. Ex. C; Willy Dep. 47:6-14; Willy Dep. Ex. 1 at 7.] He

US.130079423.10

complained about Stauber's management of his performance, alleging that she was "more hostile" and "trying to push his buttons" in one-on-one meetings, provided him with "less resources," and did not award him equity for his 2017 performance.  [Anthony Decl. Ex. C; Willy Dep. Ex. 1 at 7.]  He also complained that others had made inappropriate comments years ago, including three events that allegedly occurred nearly a decade earlier:

    a) In 2007, Stutz allegedly told Willy that he was a great hire because the person who was interviewed before him was "too gay for the lab and wouldn't fit in."  [Willy Dep. Ex. 1 at 1.]

    b) In 2008, Stutz allegedly said that he found some gay pornography in his son's drawer and that his "son better not be a fag."  [*Id.*]

    c) In 2009, Baker allegedly said, "I hate fags," and "[n]ot all fags, just the flamboyant ones."  [*Id.*][4]

Willy also shared three more recent alleged events:

    a) In 2017, after Willy asked Senior Research Fellow Deborah Luffer Atlas to be his mentor, Atlas told him that she only mentors women.  [Willy Dep. Ex. 1 at 2.]

    b) In 2017, while waiting for the restroom, Stutz told Willy to "use the woman's room, if all the weirdo transgender are using whatever restroom they want to[,] the rest of us might as well."  [*Id.*]

    c) In November 2017, Atlas shared with Willy and others in a meeting that her kids pretend to be gay because it is cool.  When Willy "spoke up" about respecting those struggling to come out,  Atlas allegedly said, "whatever," and rolled her eyes.  [*Id.* at 3.]

Despite the passage of time since some of the events Willy reported, Lilly legal directed Bernice Anthony ("Anthony"), Human Resources Consultant, to investigate Willy's concerns. [Anthony Decl. ¶¶ 6-7; Anthony Decl. Exs. C, D.]  She interviewed Willy, then interviewed four others, including Baker, Stauber, and Stauber's supervisor, Chief Scientific Officer

---

[4] Willy testified that about a year or so after Baker allegedly made this comment, Willy reported it to Tracy Williams, who was Baker's supervisor at the time.  [Willy Dep. 31:10-25.]  He claims that she suggested that he talk directly with Baker, although Willy admittedly did not.  [Willy Dep. 37:1-39:12.]

US.130079423.10

Thomas Jones.  [Anthony Decl. ¶ 7; Anthony Decl. Ex. D; Deposition of Bernice Anthony ("Anthony Dep.") 35:17-36:17.]  On June 1, 2018, Anthony notified Willy that she had determined that Stauber had not violated Lilly's Conduct in the Workplace policy.  [Anthony Decl. Ex. D at 10.]  She continued her investigation into the comments allegedly made by others.  [*Id.* at 10-30.]

### G.      Willy Reports Concerns Of Retaliation, And Lilly Investigates Them.

Days later, Willy emailed Vice President of Toxicology (and Stauber's supervisor's supervisor), Carl McMillian, asking for time to "discuss some inappropriate behavior that has been occurring . . . over the past decade" and alleging that "Anja [Stauber] and others [were] retaliating now."  [*Id.* at 10.]  McMillian and Anthony met with Willy to discuss his concerns.  [Anthony Dep. 15:21-16:4; Anthony Dep. Ex. 3 at 1.]  Willy claimed that Stauber told him that "he broke trust by going to HR,"[5]  excluded him from meetings, and was creating a "paper trail" from their one-on-ones. [Anthony Decl. Ex. D at 11-12; Anthony Dep. Ex. 3 at 1.]  Willy also met with Pankaj Choudhary ("Choudhary"), Director – Global Investigation COE and Anthony's supervisor, and shared the same concerns with him.  [Anthony Decl. Ex. D at 12; Anthony Dep. Ex. 3 at 1.]  Anthony continued her investigation, meeting with Willy, Stauber, and Jones, again, and interviewing four others, including Stutz and Atlas.  All denied Willy's allegations.  [Anthony Decl. Ex. D at 14-26; Anthony Dep. Ex. 3 at 1-5.]

---

[5] Willy surreptitiously recorded this – and other – conversations.  [Willy Dep. 159:9-160:5; June 21, 2018 Recording (Part III).]  His recording confirms Stauber's recollection:  She acknowledged that "trust has been lost on both sides" and explored ways to "rebuild that trust," but she did not connect the loss of trust to Willy's reports to HR.  [June 21, 2018 Recording (Part III.]  In fact, it was Willy – not Stauber – who said that their trust was "broken."  [*Id.*]  He said: "There's – so trust is, you're right, it's – it's been broken time and time again."  [*Id.*]

On August 7, 2018, Anthony and Choudhry met with Willy to notify him that the facts discovered during the investigation did not corroborate his allegations and that they were closing the case. [Anthony Decl. Ex. D at 27-28; Willy Dep. 189:23-190:3; Willy Dep. Ex. 13.] Anthony provided Willy with a Closure of Investigation Memo, encouraging him to contact Human Resources with any additional concerns of discrimination or retaliation. [Willy Dep. Ex. 13.]

### H.    **Stauber Continues Coaching Willy.**

In the meantime, Stauber continued to have conversations with Willy about his performance. [Stauber Decl. ¶ 11; Stauber Decl. Ex. A; Stauber Dep, 53:20-54:9.] At the end of April 2018, Willy asked Stauber about attending a CRISPR-Cas 9 conference. [Stauber Dep. 59:19-21.] Stauber had supported Willy's attendance at multiple conferences over the past two years, including a conference in Italy, meetings in Germany and Norway, a conference in Montreal, two conferences on the east coast, and the PRIDE conference. [Willy Dep. 137:21-145:21.] But she recommended that he not attend the CRISPR-Cas 9 conference. [Stauber Dep. 59:6-60:23.] Willy already had traveled considerably that year for conferences and had plans to travel later in the year, too. [*Id.* 59:19-25.] Stauber asked him to evaluate those and make trade-offs, and she encouraged him prioritize focusing on his internal lab work and delivering on the business strategies. [*Id.* 59:19-60:9.]

Around July 2018, Stauber scheduled a performance check in meeting with Willy. [*Id.* 53:20-54:9.] She told Willy that his performance was trending toward not meeting expectations, and she outlined objectives for Willy to accomplish to improve his performance before the more formal mid-year check in. [*Id.* 54:10-17.] Willy resisted the feedback and failed to improve his performance. [Stauber Decl. ¶ 13.] So, in August 2018, Stauber and her supervisor, Jones, worked with Amy Waltman in Lilly Employee Relations to finalize feedback for Willy's mid-

US.130079423.10

year review.  [Stauber Dep. 51:21-52:16; Anthony Decl. Ex. E at 14.]  Waltman recommend giving Willy a written warning and putting him on a performance improvement plan because of his performance problems, but Stauber rejected her recommendation.  [Stauber Dep. 51:21-52:16; Anthony Decl. Ex. E at 18; Stauber Decl. ¶ 13.]  Jones delivered the mid-year review (and no discipline) to Willy on August 2, 2018.  [Anthony Decl. Ex. E at 17.]

## I.    Willy Voluntarily Resigns Two Months After Accepting A More Lucrative Job With A Competitor.

On August 24, 2018, Willy notified Lilly that he was resigning effective September 7, 2018, to work for a competitor.  [Willy Dep. 192:6-13; Willy Dep. Ex. 14.]  Lilly accepted Willy's resignation, and his employment ended September 7, 2018.  [Willy Dep. 192:6-13; Willy Dep. Ex. 14.]

Although Lilly did not know it, Willy had been applying for jobs since June 2018, and had accepted a more lucrative job in San Diego, California, by July 6, 2018.  [Willy Dep. 236:10-237:9; Willy Dep. Ex. 17.]  He waited nearly two months to tell Lilly, though, because he wanted to finish a manuscript and receive credit as an author.  [Willy Dep. 237:20-238:25.]

## J.    Lilly Learns That Willy Filed An EEOC Charge While He Was Employed.

On July 25, 2018, about six weeks before Willy resigned his employment, he filed a Charge of Discrimination with the Equal Employment Opportunity Commission  ("EEOC") alleging sex discrimination and retaliation.  [Anthony Decl. ¶ 9; Anthony Decl. Ex. F.]  Lilly did not receive notice of the Charge from the EEOC until after Willy resigned.  [Anthony Decl. Ex. F.]  Notably, there is no evidence that Willy amended his Charge to include any information or allegations about his resignation or filed a new one.

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the record shows "no genuine dispute as to any

US.130079423.10

material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a), (c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party need not positively disprove the opponent's case; rather, it may prevail by establishing the lack of evidentiary support for that case. *See Celotex*, 477 U.S. at 327. The nonmoving party may not simply rest upon the pleadings but must instead submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial. *Woosley v. C.R. England, Inc.*, 890 F. Supp. 2d 1068, 1071 (S.D. Ind. 2012) (citation omitted). Mere speculation or conjecture will not defeat a summary judgment motion. *Packman vr. Chi. Trib. Co.,* 267 F.3d 628, 637 (7th Cir. 2001) (citation omitted). Neither the "mere existence of *some* alleged factual dispute between the parties," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986), nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

## IV. **ARGUMENT**

In this lawsuit, Willy alleges that Lilly discriminated against and harassed him based on his sex[6] and retaliated against him in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). [Filing No. 55 at 5-8.] All his claims fail as a matter of law based on the undisputed facts, and Lilly is entitled to summary judgment.

### A. **Willy's Constructive Discharge Claim Fails.**

During his employment at Lilly, Willy was promoted three times and received tuition reimbursement for both his master's and doctorate degrees. He was never disciplined and left of

---

[6] Willy alleges discrimination based on gender, gender stereotype, and sexual orientation. [*See* Compl. ¶¶ 55, 60, 66.] These are one in the same – a claim of discrimination based on sex. *See Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1743 (2020).

US.130079423.10

his own accord to accept a higher paying job in San Diego.  Nonetheless, he claims that Lilly discriminated against him based on his sex and retaliated against him for reporting it.  With little to underpin either claim, Willy seeks to characterize his voluntary resignation as a constructive discharge.  That claim fails.  Willy failed to exhaust administrative remedies with respect to his purported constructive discharge, and regardless, the facts do not support it.

### 1. Willy Failed To Exhaust Administrative Remedies With Respect To Any Constructive Discharge Claim.

As an initial matter, Willy cannot premise his sex discrimination or retaliation claim on his alleged constructive discharge because he failed to exhaust his administrative remedies with respect to it.  A plaintiff claiming discrimination must file a charge with the EEOC within 300 days of the alleged adverse employment action for a Title VII claim.  42 U.S.C. § 2000e–5(e); *Adams v. City of Indianapolis*, 742 F.3d 720, 729 (7th Cir. 2014).  If an EEOC charge is not timely filed, "the employee may not challenge the [alleged unlawful employment] practice in court." *Chaudhry v. Nucor Steel-Indiana*, 546 F.3d 832, 836 (7th Cir. 2008) (citation omitted).

Willy resigned on September 7, 2018 [Willy Dep. 192:6-13; Willy Dep. Ex. 14], and his "resignation triggers the limitations period for a constructive-discharge claim." *Green v. Brennan*, 136 S. Ct. 1769, 1782 (2016).  Accordingly, his deadline to file a new EEOC charge or amend his prior Charge to include a constructive discharge claim was August 31, 2019.  But Willy never filed a new charge or sought to amend his prior one.  The Seventh Circuit has applied the "scope of the charge" doctrine to bar a later constructive discharge claim where – as here – the EEOC charge "does not allege constructive discharge, and the charge makes no suggestion that Plaintiff's working conditions were intolerable such that a reasonable person would have felt compelled to resign."  *See Russell v. Eli Lilly & Co.*, No. TH01-0160-CT/H, 2002 WL 31427441, at *5 (S.D. Ind. Oct. 16, 2002) (citing *EEOC v. Univ. of Chi. Hosps.*, 276

12

F.3d 326, 331 (7th Cir. 2002); *Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir.1996)). Having failed to exhaust his administrative remedies, Willy's constructive discharge claim must be dismissed.

### 2. <u>Willy Cannot Establish A Constructive Discharge Claim.</u>

Procedural shortcomings aside, Willy still cannot sustain his sex discrimination or retaliation claim on a constructive discharge theory. A constructive discharge occurs when the plaintiff is "forced to resign because his working conditions, from the standpoint of the reasonable employee, had become unbearable." *Chapin v. Fort-Rohr Motors, Inc*., 621 F.3d 673, 679 (7th Cir. 2010) (citing *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004)). As an initial matter, the undisputed facts reveal that Willy was not "forced" to resign. Willy began looking for other employment in June 2018, and had accepted a higher paying job with a competitor by July 6, 2018. Yet he admittedly *waited two months* before giving Lilly his two weeks' notice so that he could receive credit as author for a manuscript. His voluntary two-month delay in leaving Lilly – particularly when it was for a more lucrative job – undercuts any characterization that his resignation was "forced." Indeed, it was not.

Willy also cannot establish that his work environment was "unbearable." To prevail on a constructive discharge claim, "a plaintiff [must] show working conditions even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress, thereby allowing an employer to address a situation before it causes the employee to quit." *See Chapin*, 621 F.3d at 679 (internal and external citations omitted). Willy cannot show conduct even remotely equivalent to a hostile work environment (*see supra* Part IV. C), much less above and beyond it. *See Suders*, 542 U.S. at 133-34 (citation omitted). In fact, at the time he quit, Willy had heard only one offensive comment in nearly a decade, and that comment was not even directed at him. This is not

US.130079423.10

enough.  Because Willy has no evidence to establish a constructive discharge, he cannot pin his

sex discrimination or retaliation claims on the ending of his employment.

### B.       Willy's Sex Discrimination Claim Based On Other Alleged Actions Fails.

In his Statement of Claims, Willy vaguely alleges that he "was subjected to . . . less

favorable terms, conditions, and different job assignments" because of his sex.  [Filing No. 55 at

6.]  To survive summary judgment on a sex discrimination claim, Willy must establish that he

(1) is a member of a protected class; (2) was meeting Lilly's legitimate performance

expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than

similarly situated employees outside his protected class.  *Patterson v. Avery Dennison Corp.*, 281

F.3d 676, 680 (7th Cir. 2002) (citation omitted).  Importantly, "[n]ot everything that makes an

employee unhappy is an actionable adverse action."  *Smart v. Ball State Univ.*, 89 F.3d 437, 441

(7th Cir. 1996).  Rather, an actionable adverse action "is one that significantly alters the terms

and conditions of the employee's job."  *See Crews v. City of Mt. Vernon*, 567 F.3d 860, 869 (7th

Cir. 2009) (citation omitted).  It causes "a significant change in employment status, such as

hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a

decision causing a significant change in benefits."  *Burlington Indus., Inc. v. Ellerth*, 524 U.S.

742, 761 (1998); *Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009).

If Willy establishes a *prima facie* case, the burden of production shifts to Lilly to

"articulate a legitimate, non-discriminatory reason" for the adverse employment action.  *Novak v.

Bd. of Trs. of So. Ill. Univ.*, 777 F.3d 966, 974 (7th Cir. 2015) (citation omitted).  Willy then can

survive summary judgment only if he can present sufficient evidence that Lilly's proffered

reason was nothing more than pretext for discrimination.  *Id.* (citation omitted).  The ultimate

burden of proof always rests with Willy.  *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248,

253 (1981) (citations omitted).

Based on his Statement of Claims and deposition testimony, Willy appears to be complaining about his lab space and support, not being permitted to attend certain conferences, and Lilly's decision not to award him equity (i.e., Lilly stock) in 2017. None, however, amount to an actionable adverse employment action upon which sustain a discrimination claim. Moreover, Willy cannot show that he was treated any less favorably than other similarly situated employees or that Lilly's legitimate business reasons for its actions were pretext for unlawful discrimination.

**Lab Space and Support.** Lilly allocated Willy with lab space and support upon promoting him from a P4 to an R1 in October 2016.[7] Permitting Willy to share in the same lab space as other R path scientists and providing him with direct reports, regardless of size and amount, in connection with a promotion hardly could be an actionable adverse action, particularly when Willy does not challenge the promotion. *See Nielson v. Acorn Corrugated Box Co.*, No. 01 C 1988, 2002 WL 1941365, at *6 (N.D. Ill. Aug. 21, 2002) (holding that change to workstation area does not rise to the level of an adverse employment action).

Willy also cannot show he was treated differently than any similarly situated employees. A "similarly situated employee must be 'directly comparable to [him] in all material respects.'" *Zayas v. Rockford Mem. Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014) (quoting *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)). "Although precise equivalence is not required," *Zayas*, 740 F.3d at 1158 (internal quotations and citation omitted), the similarly situated employee and the plaintiff must "have engaged in similar conduct without such

---

[7] If Willy had complaints about his lab space and support, he did not reference them in a timely filed EEOC charge. He filed his first – and only – EEOC charge on July 25, 2018, 662 days after his promotion, and – notably – did not even mention the size of his lab space. Willy's failure to exhaust his administrative remedies prevents him from premising his sex discrimination claim on these complaints.

differentiating or mitigating circumstances as would distinguish . . . the employer's treatment of them." *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 540 (7th Cir. 2007) (citation omitted). Willy has no such evidence of a similarly situated employee.

Presumably, Willy contends that he was treated differently than the two other research scientists (Baker and Malherbe) in the Investigative Toxicology group who reported to Stauber. But although the three reported to the same supervisor, they were not similarly situated. Baker, who had been Willy's supervisor for 9 years, from 2007 to 2016, was an R2 (Senior Research Scientist), and Malherbe was an R3 (Principle Research Scientist). [Willy Dep. 24:19-23; Stauber Decl. ¶ 9.] Both Baker and Malherbe, unlike Willy, were experienced and established scientists at Lilly who had been growing their labs (and need for space and support) for more than a decade. [Stauber Decl. ¶ 10; Stauber Dep. 67:23-68:4.] Willy, by contrast, was only a newly promoted R1 (Research Scientist). These differences explain any alleged disparity in space and difference in support.

For the same reasons, Willy cannot show that Stauber's legitimate reasons for the space and support decisions are a pretext for discrimination. He does not claim, for example, that she ever said anything negative or demeaning to him about his sexual orientation. To the contrary, Stauber had been a staunch supporter of Willy, including after she learned about his sexual orientation: She supported Willy's double promotion from a P2 to a P4, and – in the same year – supported a second promotion for Willy from a P4 to an R1 (Research Scientist). [Stauber Decl. ¶¶ 6-7.] And while Willy may disagree with Lilly's allocation of lab space and support, his disagreement – without more – is insufficient to establish pretext. *See, e.g.*, *Ineichen v. Ameritech*, 410 F.3d 956, 960 (7th Cir. 2005) (explaining "it is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee.

US.130079423.10

Rather, the only question is whether employer's proffered reason was pretextual, meaning that it was a lie") (internal quotations and citation omitted).

**Conference Attendance.**  The same is true of Willy's complaint about conference attendance.  Willy admits that Stauber was supportive of his attendance at multiple conferences in both 2017 and 2018.  These include a conference in Italy; meetings in Germany and Norway, a conference in Montreal; two conferences on the east coast; and the PRIDE conference.  [Willy Dep. 137:21-145:14.]  At some point, Stauber admittedly discouraged Willy's attendance at additional conferences, including the CRISPR-Cas9 conference.  [Willy Dep. 151:15-152:1; Stauber Dep. 59:19-25, 60:20-23.]  Willy already had taken time away from developing his lab to attend other domestic and international conferences, and Stauber wanted him to start focusing on and prioritizing his own internal lab work and delivering on his portfolio.  [Stauber Dep. 59:19-60:9).]

Stauber's decision not to support Willy's attendance at additional conferences is not an actionable adverse action, and it cannot – as a matter of law – sustain Willy's sex discrimination claim.  *See Murray v. Chicago Transit Auth.*, 252 F.3d 880, 888 (7th Cir. 2001) (holding that refusal to approve travel plan to a conference is not a tangible employment action); *Bell v. E.P.A.*, 232 F.3d 546, 555 (7th Cir. 2000) (holding that cancelling a conference called by the plaintiff was a "trivial matter[] that do[es] not rise to the level of actionable retaliation") (citations omitted).  Moreover, Willy admittedly has no knowledge about how his conference attendance compared to Baker's, Malherbe's, or anyone else's (Willy Dep. 153:2-24), so he cannot show that Stauber treated similarly situated individuals differently.  Nor, can he show that Stauber's legitimate decision to discourage further conference attendance in light of Willy's

17

already extensive travel and need to focus on establishing his lab was a pretext for discrimination.

**Equity.**  Willy's complaint about the 2017 denial of equity fares no better.  Lilly offers equity in form of Lilly stock, but only 30 to 50 percent of P4 to R2 employees receive it each year, and decisions about whether and to whom to award it are discretionary.  [Stauber Dep. 31:20-32:19.]  Stauber did not award Willy with equity for 2017, because only a small percentage of R1s receive equity, and Willy's performance as compared to his peers had not merited it.  [Stauber Decl. ¶ 12; Stauber Dep. 31:20-32:21; 86:3-8])  Willy had struggled with his new responsibilities as reflected in Stauber's well-documented feedback to Willy that year.  [Willy Dep. Ex. 12 at 3; Stauber Decl. ¶¶ 11-12; Stauber Decl. Ex. A.]

The Seventh Circuit has explained that "the denial of a monetary perk, such as a bonus . . . , does not constitute an adverse employment action if it is wholly within the employer's discretion to grant or deny and is not a component of the employee's salary."  *See, e.g.*, *Tyler v. Ispat Inland Inc.*, 245 F.3d 969, 972-73 (7th Cir. 2001) (citations omitted); *Rabinovitz v. Pena*, 89 F.3d 482, 488-89 (7th Cir. 1996) (holding that the lack of a bonus was not an adverse action because the plaintiff received a low performance rating, bonuses are discretionary, and bonuses are not tied to decreases in wages and salary).  Because awarding equity is discretionary at Lilly, the decision not to award it to Willy is not an actionable adverse employment action.  Moreover, Willy has not named any other employee – similarly situated or otherwise – who received equity that year.  Further, Stauber decided not to award Willy additional compensation via an equity grant for legitimate non-discriminatory reasons – i.e., he had not shown exceptional performance – and Willy has no evidence that this was pretextual.

US.130079423.10

Absent any actionable adverse actions,[8] unable to identify anyone who was similarly situated employee and treated more favorably, and lacking evidence of pretext, Willy's sex discrimination claim fails.

### C.     Willy's Sexual Harassment Claim Fails.

Willy also claims that Lilly subjected him to a hostile work environment based on his sex. That claim fails, too. To establish a hostile work environment, Willy must show that (1) the work environment was subjectively and objectively offensive, (2) the conduct was sex-based, (3) the conduct was severe or pervasive, and (4) a basis for employer liability. *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010) (citation omitted); *Ezell v. Potter*, 400 F.3d 1041, 1047 (7th Cir. 2005). In this lawsuit, Willy claims that three people – Stutz, Atlas, and Baker – made six comments – none of which were directed at him – over the course of ten years. Those alleged comments are insufficient as a matter of law to sustain Willy's hostile work environment claim.

### 1.     Stutz's Three Alleged Comments Made Over Ten Years Are Not Legally Actionable.

First, Willy alleges that a Stutz, a technician, made three comments: (1) in 2007, he allegedly said that another applicant was "too gay for the lab," (2) in 2008, he allegedly said that his son "better not be a fag," and (3) in 2017, he allegedly said that Willy could use the women's restroom when the men's was occupied because the "transgender weirdos" use whatever

---

[8] Willy's Statement of Claims references other gripes, too, including "disparity in career planning, removal from projects, diminishing roles in existing projects, [and] performance standards." [Filing No. 55 at 3.] None is an actionable adverse action, though. *See, e.g., Boss v. Castro*, 816 F.3d 910, 919 (7th Cir. 2016) (holding "[u]nfair reprimands or negative performance reviews, unaccompanied by tangible job consequences" insufficient to constitute adverse actions) (citation omitted); *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (holding harder work assignments do not rise to level of adverse action).

19

restroom they want. While Lilly in no way condones such comments (if made), they are insufficient to support Willy's hostile work environment claim for two reasons.

First, there is no basis for employer liability. Under Title VII, an employer's liability depends on the status of the harasser. *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). Where the harasser is, like Stutz, a coworker, "the employer is liable only if it was negligent in controlling working conditions." *Id.* Willy has no evidence to establish that Lilly was negligent in discovering or remedying Stutz's alleged conduct. In 2017, Willy emailed Stauber that "an associate made an LGBT slur yesterday to [his] face," and admits that "she responded rapidly." [Willy Dep. 111:3-15; Willy Dep. Ex. 11.] Although Willy claims to be dissatisfied with Stauber's response, he did not report that Stutz made any further comments. Moreover, he never reported Stutz's alleged comments in 2007 and 2008 to anyone until 2018, i.e., ten years after Stutz allegedly made them. Willy cannot hold Lilly liable for conduct of which admittedly failed to make it aware. *See Durkin v. City of Chicago*, 341 F.3d 606, 612-13 (7th Cir. 2003) (holding an employer will not be liable for alleged coworker harassment "when a mechanism to report the harassment exists, but the victim fails to utilize it") (citation omitted).

In any event, three comments made over a ten-year time span fall far short of being severe or pervasive enough to establish an actionable hostile work environment. As the Seventh Circuit has explained, "[w]hether the harassment rises to [an actionable] level turns on a constellation of factors that include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Ezell*, 400 F.3d at 1047 (internal marks and citation omitted). These three comments allegedly made over ten years were not frequent. They were not physically threatening or humiliating. Notably, only two related to

20

anyone's sexual orientation, and none were directed at Willy. In fact, there is no evidence that

Stutz even knew Willy's sexual orientation when these comments allegedly were made. And

there is no evidence that these alleged comments interfered with Willy's work performance.

Indeed, during the ten years when these few comments allegedly were made, Willy worked full-

time at Lilly while successfully pursuing – at Lilly's expense – his master's and doctorate

degrees, and was promoted three times, including one double promotion and one research titles

promotion. The Seventh Circuit squarely has ruled that it "will not find a hostile work

environment for mere offensive conduct that is isolated, does not interfere with the plaintiff's

work performance, and is not physically threatening or humiliating." *Yancick v. Hanna Steel

Corp.*, 653 F.3d 532, 544 (7th Cir. 2011) (citation omitted); *see also Saxton v. Am. Tel. & Tel.

Co.*, 10 F.3d 526, 533 (7th Cir. 1993) ("[R]elatively isolated instances of non-severe misconduct

will not support a hostile environment claim.") (internal marks and citation omitted). Faced with

far more egregious allegations, courts have refused to find a legally actionable hostile work

environment. So, too, the Court should refuse to find one here and dismiss Willy's harassment

claim. While Stutz's alleged comments were inappropriate, they simply do not rise to the level

of creating an actionable hostile work environment.

### 2. Atlas's Two Alleged Comments Are Not Legally Actionable.

Second, Willy alleges that Atlas made two inappropriate comments in 2017: (1) she

allegedly told Willy that she mentors only women and (2) she allegedly said that her kids pretend

to be gay because it's cool, and when Willy "spoke up" about the struggles of coming out, she

said, "whatever," and rolled her eyes. These comments also fall short of establishing an

actionable hostile work environment.

As an initial matter, these comments – only one of which relates to sexual orientation –

are not offensive. Even if true, it is not objectively offensive to tell someone that you mentor

21

"only women." Nor is it objectively offensive to comment that kids consider homosexuality "cool." Moreover, Atlas's alleged comments – like Stutz's alleged comments – are not frequent, physically threatening, or humiliating; and there is no evidence that they interfered with Willy's work performance, either. There also is no basis for holding Lilly liable for them. Other than telling a peer, Willy did not report Atlas's alleged comments to anyone until he reported them to Human Resources in 2018. After that, they stopped.

### 3. Baker's Single Alleged Statement Is Not Actionable.

Third, Willy claims that, in 2008, Baker said that he "hate[d] fags," "[n]ot all fags, just the flamboyant ones." [Willy Dep. Ex. 1 at 1] While inappropriate and offensive, this single isolated comment falls short of establishing an actionable hostile work environment. It was not directed at Willy and was not physically threatening. (Again, there is no evidence that Baker was aware of Willy's sexual orientation when the comment allegedly was made). Moreover, there is no evidence that it interfered with Willy's work performance. In fact, the year after Baker allegedly made this statement, Lilly hired Willy as a full-time employee reporting directly to Baker. And in subsequent years, Willy excelled with Baker's supervision and support: He obtained his doctorate degree (at Lilly's expense) while continuing to work for Lilly and was promoted three times, including one double promotion and one research titles promotion. Baker's alleged remark is a single dim star in a constellation of factors. It is insufficient as a matter of law to create an actionable hostile work environment.

There also is no basis for holding Lilly liable for it. Baker never subjected Willy to a tangible adverse action. Thus, Lilly can assert – and establish – its affirmative defense that it exercised reasonable care to prevent and correct any harassing behavior and that Willy unreasonably failed to take advantage of the preventive or corrective opportunities it offered. *See Roby v. CWI, Inc.*, 579 F.3d 779, 786 (7th Cir. 2009) (finding that plaintiff failed to take

advantage of corrective opportunities offered by employer where employer had a policy that prohibited sexual harassment that included a complaint procedure, plaintiff was clearly aware of the policy, and plaintiff failed to report the conduct for at least five months). Indeed, Lilly's Conduct in the Workplace Policy explicitly prohibits harassment based on sex and identifies multiple avenues for reporting alleged violations of it. [Anthony Decl. ¶ 4; Anthony Decl. Ex. A.] It trains employees annually on that policy. [Anthony Decl. ¶ 5: Anthony Decl. Ex. B.] And it takes complaints about alleged violations of those policies seriously. Willy claims that he told Baker's supervisor, Tracy Williams, about Baker's alleged comment and that she suggested that he talk with Baker. Willy, admitted, did not. Regardless, he does not allege that Baker said anything inappropriate based on his (or anyone else's) sexual orientation after that. Because Lilly took reasonable care to prevent and correct any harassment, and because Willy failed to take advantage of preventative and corrective opportunities, Willy cannot establish employer liability for Baker's alleged conduct, either.

Separate, or together, the six comments about which Willy complains do not, as a matter of law, create an actionable hostile work environment. They were too few and far between. They were not directed at Willy (and, in some cases, not directed at anyone's sexual orientation). They remained unreported for years. And there is no evidence that they interfered with Willy's work. For all of these reasons, Willy's hostile work environment claim fails.

### D. Willy's Retaliation Claim Fails.

Finally, Willy claims that Lilly retaliated against him. Although not entirely clear, Willy appears to pin his retaliation claim on an alleged failure to investigate and purported retaliatory harassment. His retaliation claim – regardless of theory – fails as a matter of law.

23

### 1. Willy's Retaliatory Failure To Investigate Claim Fails.

Based on his Statement of Claims, Willy appears to pin his retaliation claim on Lilly's alleged failure to adequately investigate his report to Human Resources. That investigation, though, included interviewing and talking with multiple individuals, some more than once, who reached into the upper echelons of Lilly management. They included Willy, his former supervisor, his current supervisor, his supervisor's supervisor (who was Lilly's Chief Scientific Officer), and his supervisor's supervisor's supervisor (who is Lilly's Vice President of Toxicology). Moreover, notwithstanding that one of Lilly's most experienced investigators conducted the investigation, she did so in partnership with her supervisor and legal.

To the extent such an investigation could ever fairly be characterized as "inadequate," it does not – as a matter of law – amount to a materially adverse action on which to sustain a retaliation claim. *See, e.g.*, *Johnson v. ITT Corp.*, No. 1:10-CV-142, 2011 WL 3875598, at *8 (N.D. Ind. Sept. 1, 2011) (failure of employer to launch investigation into plaintiff's complaint not an adverse action as it was not a "quantitative or qualitative change in the terms or conditions of his employment") (internal marks and citation omitted); *Clemmer v. Ofc. of Chief Judge of Circuit Court of Cook County and State of Ill.*, No. 06 C 3361, 2008 WL 5100859, at *5 (N.D. Ill. Dec. 2, 2008) (holding that an allegedly insufficient investigation of an employee's complaint does not rise to the level of a materially adverse action because she was not "denied any investigation whatsoever." "Clemmer may have preferred her employer to do more in in its investigation, but its failure to conduct an inquiry into her satisfaction does not constitute an adverse action.").

### 2. Willy's Retaliatory Harassment Claim Fails.

Willy also argues that he experienced retaliatory harassment, but even a generous reading of Willy's complaints about Stauber's conduct is insufficient to sustain his retaliatory harassment

24

claim. Willy apparently claims that, after he reported concerns to Lilly's Human Resources in March 2018, Stauber told him that "he had broken trust" by going to HR, excluded him from meetings, criticized his performance, and increased their one-on-one meetings. [Filing No. 55 at 3-4.] Even if true, this falls far short of establishing retaliatory harassment, and Willy has no evidence of causation regardless.

### a.  The Alleged Conduct Falls Far Short Of Actionable Harassment.

The Seventh Circuit has recognized that continued retaliatory harassment can be sufficient to support a retaliation claim *only* when it is severe enough to cause a "significant change in the plaintiff's employment status." *Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001). "Although this is not limited to loss in pay or benefits and can encompass various forms of adversity, 'not everything that makes an employee unhappy is an actionable adverse action.'" *Slentz v. Emmis Operating Co.*, No. 1:16-cv-02568-JMS-MJD, 2018 WL 705654, at *9 (S.D. Ind. Feb. 5, 2018) (quoting *Smart*, 89 F.3d at 441). A retaliatory harassment claim is actionable "only if there is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with different responsibilities, or a decision causing a significant change in benefits." *Id.* (internal marks and citations omitted).

While Willy may have found Stauber's management of his performance uncomfortable or annoying, it did not cause any change in his employment status and, therefore, cannot form the basis of any retaliatory harassment claim. *See Harper v. C.R. England, Inc.*, No. 2:08-CV-110-PRC, 2011 WL 3421490, at *6 (N.D. Ind. Aug. 3, 2011) (holding that supervisor's telling employee that "nothing would come of his complaint" and advising him to "grow a thicker skin" did not amount to retaliatory harassment); see also *Hill v. Am. Gen. Fin., Inc.*, 218 F.3d 639, 645 (7th Cir. 2000) (finding that supervisor's rummaging through plaintiff's desk drawers and

25

garbage can and listening to plaintiff's telephone calls did not rise to the level of actionable

retaliation); *Bell.*, 232 F.3d at 555 (finding that failure to greet or speak to plaintiff and

cancelling a meeting that the plaintiff had scheduled apparently in response to plaintiff's sex

discrimination complaint was not sufficiently severe to be actionable).  Any claim otherwise is

belied by the fact that Willy waited two months after receiving a more lucrative job offer before

resigning his employment with Lilly.  *See Slentz*, 2018 WL 705654, at *9 (explaining that

alleged retaliatory harassment was not actionable "particularly given the fact that [the plaintiff]

agreed to stay on for more than a month following her resignation announcement").

### b.     Willy Cannot Establish Causation.

Willy's retaliatory harassment claim also fails because Willy has no evidence that

Stauber's criticisms and management of his performance were in any way related to his protected

activity.  While temporal proximity may indicate a causal connection between protected activity

and an adverse action, *Lang v. Ill. Dept. of Children and Family Servs.,* 361 F.3d 416, 419 (7th

Cir. 2003) (citations omitted), it is well-established that a plaintiff must offer more than that to

support an inference of a causal link and survive summary judgment.  *Tomanovich v. City of

Indianapolis,* 457 F.3d 656, 665 (7th Cir. 2006) (citation omitted). *See also, Argyropoulos v. City

of Alton,* 539 F.3d 724, 734 (7th Cir. 2004) ("suspicious timing, standing alone," does not

establish a causal connection) (citations omitted).  Willy does not even have that much.

The undisputed record shows that Stauber had been providing Willy with ongoing

feedback, as documented in his performance management documents and one-on-one coaching

sessions, since his promotion to R1 in 2017.  [Stauber Dep. 35:21-36:15, Willy Dep. Ex. 12 at 3;

Stauber Decl. ¶¶ 11-12; Stauber Decl. Ex. A.]  Because Stauber's criticisms of his performance

predate his protected activity, Willy cannot establish causation.  *Rozumalski v. W.F. Baird &

Assocs., Ltd.,* 937 F.3d 919, 926 (7th Cir. 2019) (finding that negative performance feedback that

26

led to plaintiff's employment termination predated her complaints of sexual harassment). Other undisputed facts confirm the absence of any retaliatory animus, too. For example, despite Stauber's honest belief that Willy's performance was not meeting expectations, she rejected Employee Relations' advice and recommendation to discipline Willy for it. She chose – against Employee Relations' guidance – not to give Willy a written warning and place him on a performance improvement plan. Her decision, which post-dated Willy's protected activity, undermines any claim that Stauber harbored retaliatory animus against Willy because of his reports to Human Resources, and it cuts against any claim of causation. Absent any evidence to connect the conduct about which Willy complains to his protected activity, his retaliatory harassment claim fails for yet another reason.

## V.     <u>CONCLUSION</u>

Lilly treated Willy fairly and favorably throughout his 12-year career. It reimbursed him for tuition for his master's and doctorate degrees and promoted him three times (including one double promotion and one research titles promotion in a single year). The only reason Willy is not still working for Lilly is because Willy voluntarily resigned his employment to accept a higher-paying job for a competitor in San Diego. Although Willy may have complaints about certain aspects of his employment with Lilly, those complaints – as a matter of law – fall far short of actionable discrimination or retaliation. For the reasons explained, Lilly respectfully request that the Court grant Lilly summary judgment on all of Willy's claims.

Respectfully submitted,

FAEGRE DRINKER BIDDLE & REATH LLP

/s/ Amanda L. Shelby
Ellen E. Boshkoff (#16365-49)
Amanda L. Shelby (#27726-49)
Adriana Figueroa (#33776-49)
300 North Meridian Street, Suite 2500
Indianapolis, IN  46204
Telephone: (317) 237-0300
Facsimile:  (317) 237-1000
ellen.boshkoff@faegredrinker.com
amanda.shelby@fegredrinker.com
adriana.figueroa@faegredrinker.com

Attorneys for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2020, the foregoing was filed electronically.  Parties

may access this filing through the Court's system.  Notice of this filing will be sent to the

following by operation of the Court's electronic filing system:

Brandon E. Tate
TATE BOWEN DAUGHERTY FUNK SPANDAU LLP
156 East Market Street, Suite 300
Indianapolis, IN 46204
brandon.tate@tatebowen.com

Tarah M. Baldwin
BALDWIN LEGAL GROUP, LLC
8500 Keystone Crossing, Suite 470
Indianapolis, IN 46240
tarah@baldwinlegal.llc

/s/ Amanda L. Shelby

28