UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JEFFREY A. WILLY,         )
            )
       Plaintiff,     )
            )
   v.          )     CASE NO. 1:18-cv-03934-RLY-DML
            )
ELI LILLY AND COMPANY,   )
            )
       Defendant.   )

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**Comes now** Plaintiff, Jeffery A. Willy, by counsels, and in opposition to Defendant Eli Lilly and Company's Motion for Summary Judgment states as follows:

### Introduction

If Jeffrey A. Willy ("Willy") just would have remained silent, perhaps he would have continued to be 'fast-tracked'[1]. Willy devoted eleven (11) years of his career to Eli Lilly & Company ("Eli Lilly") in the field of toxicology. However, after years of unanswered requests for help from multiple supervisors and Eli Lilly employees about homophobic slurs, denial of mentorship based on his gender/sexual orientation, disparity in pay, gap in lab support, and the grabbing of his buttocks by a male superior among other things, Dr. Willy continued following Eli Lilly's Red Book employee manual and made a report with the Human Resources Department ("HR") regarding his experiences of sexual harassment, discrimination, and retaliation.  Not

---

[1] Defendant's Memorandum of Law in Support of Motion for Summary Judgment ("Def. SJ Memo"), at 1, ¶ 1.

until those reports were made to HR had Willy ever received a negative report or review regarding his work product. Not once.

Soon after filing a complaint with HR, Willy's supervisor, Anja Stauber ("Stauber"), began supplementing his file with poor reviews, denying his ability to attend conferences, and made one-on-one meetings into excruciating ordeals; ordeals that lead to Dr. Willy contemplating self-harm and leading him to the realization that he, a homosexual male, was not welcome at Eli Lilly. After the original report to HR, Willy went to his supervisor, and then her supervisor, and then that supervisor's supervisor while continually making requests for HR intervention that all went unanswered. No advocate was provided for Willy at any point by Eli Lilly. His pleas to HR were ignored. The result was the introduction by Eli Lilly managers of the "Trust Equation." Willy surreptitiously recorded Stauber as she told him verbatim, "Trust has been lost… What are you going to do and commit to do to rebuild that trust and heal some of these things that have occurred?"[2] When he went further up the management line in accordance with the Red Book, he asked Stauber's supervisor, Thomas Jones, "What would you do if you were me?" Stauber's supervisor answered, "I would leave. I think that would be the option."[3]

Willy went to supervisors, to no avail. Willy went to the EEOC, and Eli Lilly alleges it was not even contacted by the EEOC before receiving the dismissal. When the EEOC's decision was received by Eli Lilly, it reopened and closed Willy's case regarding his complaints of discrimination, harassment, and retaliation the same

---

[2] Dkt 67-1 - June 21, 2018 Recording (Part III)
[3] Dkt 67-2 - Jones_24July2018 Recording at 16:45.

day. Willy was a homosexual male whose legitimate concerns were wrongfully discarded by his supervisors, employer, and the entity tasked with protecting him from his employer, the EEOC.

## Undisputed Material Facts and Procedural History

Willy is a man whose sexual orientation is homosexual. [Dkt. 67-3, *Deposition of Jeffrey A. Willy*, p. 89; lines 16-19.] Mr. Willy received his Bachelor of Science Degree in Molecular Genetics from the University of Rochester in 2006. [*Id.*, p. 11; lines 19-25 and p. 12; lines 1-3.] Lilly hired Willy as a contractor in 2006. [*Id.,* p. 15; lines 24-25 and p. 16 lines 1.] Mr. Willy began working as a full-time employee for Eli Lilly in November of 2007 as a Toxicologist. [*Id.,* p. 26; lines 7-8.] Willy received his Master's of Science Degree in Biology in 2010 from Purdue University. [*Id.,* p. 11; lines 6-25.] Willy was promoted to a Senior Toxicologist in March 2012 and promoted to a Consultant Toxicologist in March 2016. [*Id.,* p. 76; lines 22-25 and p. 77; lines 1-4] [*Id.* 96, p. 4: lines 4-9.] In 2016, Willy received his Doctor of Philosophy (Ph.D.), in Biochemistry and Molecular Biology, in 2016 from the Indiana University School of Medicine. [*Id.*, p. 13; lines 7-15.] Subsequently, Willy was converted to a Research Scientist in October 2016. [*Id.*] From 2007 to 2018, Willy was a full-time employee with Eli Lilly and Company ("Lilly"). [*Id.,* p. 26; lines 7-8.]

In 2016, Willy was the first LGRAD scientist to graduate with a Ph.D. (<4 years) and presented at grand rounds, receiving multiple awards including the SOT young investigator award, best manuscript at IUSM, and GRC travel award. [Dkt. 67-4, *Exhibits to Deposition of Jeffrey A. Willy, p. 49-50.*]

## Disputed Issues of Material Fact

Willy endured discrimination, harassment, a hostile work environment, and retaliation during his time at Eli Lilly as forth in detail in this brief. Eli Lilly claims that it prohibits discrimination, harassment, and retaliation.[4] Willy reported many offensive and sexist acts and harassment/discrimination, both verbal and physical, to co-workers and superiors as set forth in detail herein. Eli Lilly does not dispute the fact that no investigation had ever occurred prior to Willy's Complaint. Not one of those superiors or co-workers reported anything to HR as is the protocol in the Red Book pg. 2 of 255 in which Lilly relies on in its Motion for Summary Judgment.

Eli Lilly claims that Baker and Laurent Malherbe ("Malherbe") had larger labs due to their superiority.[5] However, while it is not disputed that Willy had less resources, less direct reports, and a smaller lab, Eli Lilly simply states that Baker and Malherbe were higher up, so they got more. In actuality, the three were working on many of the same projects in the same therapeutic areas, with similar tasks, and similar projects to support.[6] "[Willy] asked multiple times to get more support, and [] was told just to pull up his sleeves and figure out how to get it done. [He] was given more work to do[,]" without any significant increase in resources with the majority of this occurring after Stauber learned Willy was gay.[7] In fact, Willy's direct report moved on to another department, he was not afforded the opportunity to replace her,

---

[4] Dkt. 59 - Def. SJ Memo, p. 2.
[5] Dkt. 59 - Def. SJ Memo. p. 4.
[6] Dkt. 67-3 - Willy Depo. p. 103; lines 14-25.
[7] Dkt. 67-3 - Willy Depo. p. 104; lines 13-17.

and he was regularly excluded from meetings involving Stauber, Baker, and Malherbe regarding obtaining additional resources.[8]

There is no evidence that Stauber documented issues with Willy prior to his complaint. Eli Lilly acknowledged in its Answer to Plaintiff's Complaint that Willy had received more than twenty (20) inspire awards and/or spotlight points from Lilly Employees during his time there.[9] Eli Lilly also superfluously denied that these were for excellence in his performance in the same response.[10] Some of the received awards and certificates included: 1) Inspire Award: Jeffrey Willy is Recognized for Excellence in Leadership in Toxicogenomics. Recognition Type: Applause. Date: December 4, 2017; 2) Inspire Award: Jeffrey Willy is Recognized for Respect for People. Recognition Type: Applause. Date: August 9, 2016; 3) Inspire Award: Jeffrey Willy is Recognized for Excellence in Engagement. Recognition Type: Applause. Date: October 4, 2017.; 4) Inspire Award: Jeffrey Willy is Recognized for Respect for People Teamwork. Recognition Type: Applause. Date: November 3, 2017. 5) Inspire Award: Jeffrey Willy is Recognized for Excellence in ISR Investigation. Recognition Type: Applause. Date: October 4, 2016. 6) Inspire Award: Jeffrey Willy is Recognized for Excellence Thanks for with OVSOT Meeting. Recognition Type: Applause. Date: November 2, 2016. 7) Inspire Award: Jeffrey Willy is Recognized for Integrity Lab Inspection Training. Recognition Type: Applause. Date: February 22, 2017.; 8) Inspire Award: Jeffrey Willy is Recognized for Reaching Across Boundaries.

---

[8] Dkt. 67-3 - Willy Depo. p. 104; line 18 to p. 105; line 12.
[9] Dkt. 13 – Answer to Complaint – Answer to Para. 22.
[10] *Id.*

Recognition Type: Cheers. Date: May 7, 2018. 9) Inspire Award: Jeffrey Willy is Recognized for Excellence for Breakthroughs in Foundational Toxicology of CSII. Recognition Type: Bravo. Date: June 21, 2018. 10) Inspire Award: Jeffrey Willy is Recognized for Excellence Congratulations on your Tox Sci Paper. Type: Cheers. Date: May 26, 2016. 11) Inspire Award: Jeffrey Willy is Recognized for Respect for People Your Encouragement in Teamwork. Type: Applause. Date: December 14, 2016. 12) Inspire Award: Jeffrey Willy is Recognized for Excellence Thank you For Your Mentoring. Type: Applause. Date: August 29, 2017. 13) Inspire Award: Jeffrey Willy is Recognized for Excellence Lab Experience for Leairra Carter. Type: Cheers. Date: December 8, 2016. 14) Inspire Award: Jeffrey Willy is Recognized for Excellence WGCNA Analysis and Team Support. Type: Bravo. Date: March 6, 2017. 15) Inspire Award: Jeffrey Willy is Recognized for Excellence Thanks. Type: Excellence. Date: December 12, 2016. 17) Inspire Award: Jeffrey Willy is Recognized for Excellence Project Tango. Type: Bravo. Date: June 19, 2018. 18) Inspire Award: Jeffrey Willy is Recognized for 10 Years of Service. Date: November 5, 2017.

Stauber claims to have had several conversations with Willy (without any documented evidence), in 2016, claiming Willy struggled to rise to the responsibilities of his new role. However, without dispute, he was rated as meeting expectations for 2017, and there is no evidence that any of those conversations occurred or why there would be zero documentation when everything at Eli Lilly regarding performance is heavily documented and reviewed.[11]

---

[11] Dkt. 59 - Def. SJ Memo., p. 6.

July 5, 2018 is the first time Stauber informed Willy that he was trending toward not meeting expectations – *after the complaint by Willy to HR*.

> Counsel: When was the first time that he was told by you that he was not meeting expectations or that his performance was poor?

> Stauber: He was given the message in that July meeting that he was trending toward not meeting expectations.

> Counsel: **And that was the first time**; correct?

> Stauber: In those words, **yes.**[12]

## Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant also "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, (1986). "A district court should grant summary judgment only if the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Miller v. A.H. Robbins Co.*, 766 F.2d 1102, 1104 (7th Cir. 1985). When considering a motion for summary judgment, the court must view the facts and draw

---

[12] Dkt. 63-5 - Deposition of Anja Stauber p. 54; 10-17 (emphasis added).

all reasonable inferences in the light most favorable to the non-moving party. *Zillak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003).

The Seventh Circuit has developed exacting standards for summary judgment in employment discrimination cases. Seventh Circuit decisions have stated that "[i]n an employment discrimination suit, where credibility and intent are pivotal issues, [summary judgment] standards apply with added rigor." *Surti v. G.D. Searle & Co.*, 935 F. Supp. 980, 984 (N.D. Ill. 1996) (citing *Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir. 1994)). The court explains the "added rigor" language as follows:

> We first used the phrase "added rigor" in *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368 (7th Cir. 1992), explaining that the summary judgment standard "is applied with added rigor in employment discrimination cases, where intent is inevitably the central issue." Id. at 370-71. In support of this proposition, we cited *Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 97 (7th Cir. 1985) ("Summary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles."') (quoting *Pfizer, Inc. v. Int'l Rectifier Corp.*, 538 F.2d 180, 185 (8th Cir. 1976)), and *Visser v. Packer Eng'g Assocs.*, 924 F.2d 655, 660 (7th Cir. 1991) ("Caution is required in granting summary judgment, especially under a statute that allows for trial by jury, as the age discrimination law does."). Although it is understandable how one might infer from our regular use of this phrase that we meant to communicate a more stringent standard to be used in reviewing employment cases, 2Link to the text of the note the original use of this phrase indicates that it was merely included to stress the fact that employment discrimination cases typically involve questions of intent and credibility, issues not appropriate for this court to decide on a review of a grant of summary judgment.

*Alexander v. Wis. Dep't of Health & Family Servs.*, 263 F.3d 673, 681 (7th Cir. 2001) (The court has cited to the "added rigor" standard at least 30 times. *Id.* at n.2).

Therefore, the Court must be particularly suspicious of summary judgment motions

in employment discrimination cases such as this one, as summary judgment is not appropriate where intent, good faith, and subjective feelings are at issue.

These standards are especially important in the case at bar, as the defense asks that the court assess the credibility of its employees, those that discriminated, harassed, and retaliated Willy, and Willy himself, and make conclusory assertions regarding subjective feelings – *i.e., interpreting the "trust equation"* – and intent of the action of those complained against. While it is true that Willy will have to provide evidence at trial from which a reasonable jury could conclude that he was discriminated against, harassed, and retaliated against, the Eli Lilly does not meet its burden at summary judgment by presenting a bald statement on its potential liability and asking that the court believe it.

## Argument

Willy's claims consist of: 1) that he was subjected to a hostile work environment in violation of Title VII; 2) that he was discriminated against based on his sex – gender, gender stereotype, and/or sexual orientation – in violation of Title VII; 3) that he was constructively discharged in violation of Title VII; and 4) that he was retaliated against because of his reporting of harassment, a hostile work environment, and discrimination and that Eli Lilly knowingly and intentionally refused to adequately and sufficiently investigate Willy's complaint in violation of Title VII.

As the Seventh Circuit has previously held in *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 631-632 (7th Cir. 2009), Willy's testimony in his deposition is sufficient to demonstrate that he has established a prima facie case:

> The district court dismissed this claim for two reasons. First, the court stated that Darchak "provide[d] no support for her allegations besides her own self-serving deposition transcript." *Darchak v. Bd. of Educ.*, No. 07-C-104, 2008 U.S. Dist. LEXIS 51434, 2008 WL 4866055, at *6 (N.D. Ill. June 25, 2008). It is true that uncorroborated, self-serving testimony cannot support a claim if the testimony is based on "speculation, intuition, or rumor" or is "inherently implausible." *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003). But testimony based on first-hand experience is none of those things. Darchak's testimony presents specific facts, even if that testimony may be less plausible than the opposing litigant's conflicting testimony (a question we need not--nay, cannot--reach). *Id.* And while it is also true that isolated [**18] remarks are not enough to meet the plaintiff's burden, remarks coupled with an adverse employment action suffice. See *Venters v. City of Delphi*, 123 F.3d 956, 973 & n.7 (7th Cir. 1997) (citing, inter alia, *Shager v. Upjohn Co.*, 913 F.2d 398, 402 (7th Cir. 1990)). [*632] A reasonable jury could find Darchak's report of Acevedo's remarks convincing, and it is undisputed that Darchak's contract was not renewed at Acevedo's recommendation and that contract nonrenewal is an adverse employment action. Nothing more is needed to demonstrate that a plaintiff has established a prima facie case under the direct method of proof. *Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 905 (7th Cir. 2006). There need not be a rich and varied body of circumstantial evidence (a "mosaic" of discrimination, *Troupe*, 20 F.3d at 737), as long as what evidence there is adds up to discriminatory intent. See *Sylvester*, 453 F.3d at 903-04.

## I.    A material question of fact exists as to whether Jeffrey Willy was constructively discharged.

Eli Lilly asserts that Willy's constructive discharge claim fails as a factual matter and as a procedural matter. In doing so, Eli Lilly misrepresents the manner and circumstances leading to Willy leaving Eli Lilly and the job Willy accepted in San Diego being "higher paying" in a manner that apparently alleges Willy was financially better off leaving than staying. Willy left Eli Lilly and accepted a job in

San Diego to a significant financial loss with a documented loss of income, inclusive of earnings and pension loss, stated in terms of present value, of $505,838.00 as of August 13, 2019.[13] A question of fact exists as to whether Willy's separation from Eli Lilly constituted constructive discharge and Willy did not fail to exhaust administrative remedies with regards to the constructive discharge claim.

### a. *Jeffrey Willy exhausted administrative remedies with regards to a constructive discharge claim.*

As a preliminary matter, Eli Lilly has not designated any charge with the EEOC by Willy to support its assertion that Willy failed to claim "constructive discharge." Without any such a designation, this must be summarily dismissed as Eli Lilly has failed to meet its burden.

To the extent the Court elects to evaluate this claim without any charge designated as evidence by Eli Lilly to support its allegations, Willy is left to speculate as to the alleged failures of the undesignated charge. Eli Lilly's allegation with regards to the constructive discharge procedural matter appears to be that Willy's July 25, 2018 EEOC Charge of Discrimination, which again has not been designated as evidence by Eli Lilly, which alleged pervasive ongoing discrimination from November 12, 2007 to July 17, 2018 – and was designated as continuing – allegedly does not encompass constructive discharge and Willy's separation from the company just over a month and a half later – *September 7, 2018* – in which notice of said departure was even closer to the charge – *August 24, 2018* – in the administrative

---

[13] Dkt. 67-6 – Economic Impact Report.

proceedings. The EEOC issued its right to sue closing letter on September 18, 2018.[14] Eli Lilly's speculative argument is centered on case law entailing when a limitations period begins to run for the filing of a claim alleging constructive discharge. Nothing therein precludes a charge filed shortly before a constructive discharge from entailing said constructive discharge, and simply addresses a limitations period for filing thereafter a constructive discharge. Eli Lilly has designated no evidence to show that constructive discharge was not included in the July 25, 2018 Charge of Discrimination, as no such charge has been designated.

"A plaintiff may bring a Title VII claim that is "like or reasonably related to the allegations of the charge and growing out of such allegations." *Russell v. Eli Lilly & Co.,* No. TH01-0160-CT/H, 2002 U.S. Dist. LEXIS 21066, at *12 (S.D. Ind. Oct. 16, 2002) (citing *Cheek v. Western & Southern Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir. 1994)). Willy's charge with the EEOC described a pervasive and ongoing pattern of discrimination, both physical and verbal, that suggested that Willy's working conditions were intolerable such that a reasonable person would have felt compelled to resign and said items were designated as continuing. To the extent the Court entertains the argument of Eli Lilly in the complete devoid of any evidence to support its claim, this matter is akin to *Emperador-Baker v. Jazz Casino Co., LLC,* No. 16-17058, 2017 U.S. Dist. LEXIS 55611, (E.D. La. April 12, 2017) in which the Court denied a similar attempt to preclude a constructive discharge claim:

> Emperador-Baker alleges that she was forced to resign as a result of the ongoing sexually hostile work environment that she described in her EEOC charge. Although her charge cited only two specific incidents in

---

Dkt 67-7 – EEOC Right to Sue Letter.[15]Dkt. 67-8 - Stauber_05July2018.

March and May 2014, she stated that Harrah's "promotes a sexually hostile work environment" and had done so since the beginning of her employment in 1999. The EEOC could reasonably be expected to learn during its investigation of her hostile work environment charge that plaintiff resigned a few days later because of the same actions by defendant and could reasonably be expected to include that claim within the scope of its investigation.

As was the case in *Emperador-Baker*, the EEOC could reasonably be expected to learn during its investigation of Willy's sexual discrimination, retaliation, and harassment charge that Willy resigned on September 7, 2018 because of the same actions by Eli Lilly and could reasonably be expected to include that claim within the scope of its investigation.

### b. *Willy was constructively discharged.*

The leading case on constructive discharge posits that the test as to whether a separation constitutes a constructive discharge is an objective one: "did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004). The case further explains the doctrine by pointing out that the "National Labor Relations Board (NLRB) developed the doctrine to address situations in which employers coerced employees to resign, often by creating intolerable working conditions, in retaliation for employees' engagement in collective activities." Id. The court asserted that federal courts have enforced the NLRB's doctrine since the 1930's, and the doctrine has been used in Title VII cases since the inception of the modern Civil Rights Act in 1964. *Id.* at 141-142.

After March of 2018, the hostile meetings in which Willy was required to attend by Stauber increased. Stauber began reaching out to Willy's colleagues requesting negative feedback on Willy. On July 5, 2018, Stauber began a meeting with Willy by advising Willy that an HR investigation will not prevent her from providing him with a negative review on his performance.[15] Said review was not required by Lilly protocols and was done so after Stauber consulted with Human Resources. Willy inquired as to why there was a review and noted Stauber's information in said review was incorrect and/or incomplete. Stauber snapped and advised Willy that he was to only listen and not comment, "It is not about gaining your agreement it is about understanding." Stauber indicated that Human Resources required her to put in goals that Willy needed to reach rather than just provide negative feedback.[16]

On July 10, 2018, Willy was required to again attend a meeting with Stauber that was recorded.[17] The meeting began with Stauber indicating to Willy this is his chance to ask questions about the negative review provided on July 5th. Although he had not received an electronic copy like the one being placed in his PM file, it was demanded that he address his concerns and move on. Within five (5) minutes, Stauber interrupted Willy and repeatedly stated, "this isn't about agreeing, it's about understanding." Willy advises Stauber that he is uncomfortable with her report going into the PM system because it contains false and incomplete information and no

---

[15]Dkt. 67-8 - Stauber_05July2018.
[16] *Id.*
[17] Dkt. 67-9 - Anja And Jones_10July2018.

specific details on where the negative information is coming from. When Willy asked who the specific negative feedback was coming from, Stauber then became more frustrated and repeated, "What would you like and what do you want, Jeff?" Jeff calmly stated that there is no positive feedback, the assessment is not based on fact, and is not true. Willy begged Stauber that if she is in this to move forward and to continue working past things, and that all he wanted was a fair assessment. Stauber advised Willy that "it is on him to move forward." Willy prayed for the narrative to be the totality of circumstances and not just the negative. Willy stated repeatedly his confusion that these July meetings are the first time he is hearing that Stauber was not happy with his performance when other partners from the company are reporting to the contrary. Willy told Stauber that he went to her in February and she told him that everything was fine. Stauber ended the meeting by saying HR says you own your performance, there is an ambiguity, but Willy needed to decide how he is going to own that and how resilient he will be. Stauber told Willy to pick himself up by his bootstraps. Stauber said it does no good to argue the negative feedback. "How are you going to behave, work, and think differently," Stauber says. Stauber then proceeded to break down what the Trust Equation is: the closeness, intimacy in how two people are, reliability, credibility divided by self-interest then break it down and see where our trust is broken, we can find a way to increase that trust.[18]

Jeff responded to receiving formal negative feedback devoid of any construction or guidance by politely requesting to leave a meeting in which he was told by his

---

[18] *Id.*

supervisor, Stauber, that she does not treat her employees equally. Now having written Willy up for leaving in a note on his personnel file, Stauber bullied Willy by stating that he took her statements in the context that he wanted too. [19] "You chose and you choose to hear it in a context that fits your story."[20]

On the same recording, shortly after leaving the meeting with Stauber and with tears coming out finding Stauber's supervisor Jones, Jones has the following exchange with Willy where Willy indicates that he is scared and that HR and McMillian have told him is all on Willy and they can't help him:

Jones: What is resolution for you?

Willy: To start with, a fair Assessment. That two-page document is not the truth. What is going on now is not fair. Just to be heard and treated fairly.

Jones went on to say that the comments he heard that have been made were not directed at Willy and that the people making them may not know that he is gay and therefore they were not trying to be derogatory. Willy corrected Jones and advised him that some of the comments were made by those who definitely knew he was gay.[21] The July 10th conversation continued; Jones wanted to find a way to move forward. Willy indicated he was scared because of comments from Carl McMillian and Anja Stauber questioning whether they even saw a path forward for him and that scared Willy. As set forth previously, in July of 2018, Willy was told in July 2018 by Stauber, after submitting his HR Complaint against Stauber, that he was on the

---

[19] *Id.*
[20] *Id.*
[21] *Id.*

path to not meet expectations, but had not received feedback that aligned with that sort of message at any point of time before July 5th, which Stauber admitted in her deposition. Willy stated that he believed he was being coached out and that people did not want him in the department.

> **Jones**: What do you own.
> **Willy**: How I respond to people. [22]

Willy told Jones that the only negative feedback he was receiving was from Stauber since the reports in March.

> **Jones**: I think that can often be a sign of fear.  Not fear of what is going to happen to her, but that she clearly wants to find a rhythm and find a way forward and hopefully put this behind you. I don't think anyone wants to coach you out of the organization… I am not sure that any of us see a path forward and it is going to take some work on everyone's part to find that…Do you want a path forward in this organization?
> **Willy**:  Yea, I mean I'm from Indiana. Lilly has treated me very well, you guys let me get my PhD um I mean I love what I do.
> **Jones**: My commitment to you is to work to find that path forward but you are going to have to equally strong commitment to facilitate that. I'm not talking about you need to be the one that takes all the sacrifices or makes all the sacrifices… but people can't be walking on eggshells here. [23]

While speaking with Jones, Willy is informed that Jones had coached Anja about the trust equation. Jones recounts this interaction during his deposition on October 9, 2019:

> "He was with Anja [Stauber] is what he said.  He came into
>
> my room, he was crying.  I asked him to sit down.  I think
>
> my first question was, Jeff, are you okay? And he said, I'm

---

[22] *Id.*
[23] *Id.*

seeing a therapist was the first comment that he made. And I said, well, are you being as open as you need to be with your therapist? And he said, if you mean have I told him that every time I walk out of Anja's office I want to jump off the balcony on the fourth floor? Then yes, I'm being honest."[24]

This is also yet another time something is reported to a supervisor, that per the Red Book should be reported to HR, in which the supervisor does nothing – *a statement of potential self-harm.*

When Willy went further up the chain of command to Carl McMillian, he was again faced with the Trust Equation. During a recorded conversation between Willy and McMillian, Willy is told by McMillian, "I told her [Stauber] that trust is fundamental on how work gets done and shared the trust equation."[25] In deposition, McMillian had the following exchange with Plaintiff's counsel:

Q:     Did you feel that Dr. Willy needed to repair the trust after the HR complaint, the discrimination complaint?

A:     He had a role in needing to repair.

. . .

Q:     Did you ever indicate to Dr. Willy that trust had been lost on both sides of him and Anja?

[24] Dkt. 67-10 - Deposition of Thomas Jones p. 19; lines 5-15.
[25] Dkt. 67-11 - Carl (1950) recording.

A: Yes, I do recall discussing that.[26]

At three levels of management, Willy was advised that his complaints to HR were a violation of Trust. On June 7, 2019, Bronwen Mantlo, Vice President, Deputy General Counsel, and Corporate Secretary of Lilly verified the truthfulness and accuracy of the responses submitted in Answers to Plaintiff's First Set of Interrogatories to Defendant, Eli Lilly and Company. Interrogatory 17 asks, "Identify any and all employees, agents, representatives and/or contractors of Lilly that at any time, informed the Plaintiff that he had broken their trust." The Answer, "Lilly is not aware of any of its employees, agents, representatives, or contractors telling Plaintiff that he "had broken their trust[,]" yet three (3) of their employees had.[27]

Every interaction with upper management shows that they were towing the Stauber line and that Willy was not believed nor wanted at Eli Lilly due to his sex (gender/gender stereotype/sexual orientation). In a subsequent conversation that Willy held with Jones, Jones indicated that the company did not believe Willy's claims and that he had no recourse.

The evidence that Willy's supervisors wanted Willy to leave their department and Eli Lilly and did everything they could to get him to leave is irrefutable. After having never received negative feedback, Willy was required to attend at least three meetings regarding documentation for his personnel file and two of which he was instructed to not speak, but to just listen. He was told that he broke trust and that it was up to him to find a path forward, but if that path was not working for Anja

---

[26] Dkt. 67-12 - Carl McMillian Deposition p. 83; line 11 to p. 84; line 4.
[27] Dkt. 67-13 - Interrogatory Responses of Eli Lilly

Stauber, then there was no place for him. He should leave. The Trust Equation is brought up by multiple levels of management despite the knowledge that it creates a fear and anxiety in Willy. He was told that no one believed his claims, and then Human Resources begins assisting his supervisors in preparing a file noting uncorroborated claims of deficiencies – *i.e., the July 5, 2018 correspondence of Stauber to Willy*. Meanwhile, Willy is making repeated unanswered requests for advocacy from the Human Resources Department:

> "I'd asked them—I emailed [Human Resources] several times as my one-on-ones were becoming more consistent. I'd asked them to go with me to the one-on-ones, and they were very disengaged. There were several emails they never replied to. They left me on my own, they wouldn't go to the one-on-ones with me."[28]

All records of negative feedback stem only from Stauber. Late in the summer of 2018, Willy recalled an email from Stauber, "refusing to meet with management is insubordination and this is grounds for termination. She said we're setting up another meeting, if you do not go to this you will be fired. She may not have used the words you will be fired, but she said this could be grounds for removal from the company or separation."[29] Willy was simply home sick for the day.[30]

It is only natural that after the conversations held with Anja Stauber, Thomas Jones, and Carl McMillian after the filing of the HR complaint and a lack of support or advocacy by HR, the only path forward was out. Willy saw the handwriting on the

---

[28] Dkt. 67-3 - Willy Depo. p. 188; lines 12-18.
[29] Dkt. 67-3 - Willy Depo. p. 202; lines 17-23.
[30] Dkt. 67-3 - Willy Depo. p. 202; lines 5.

wall, and so he applied for a position at a different company, even though he would suffer significant financial detriment more than $500,000.00 by leaving Eli Lilly.

A reasonable jury could easily find that Willy was subjected to a sexist and homophobic culture in which upon reporting to Human Resources led Willy to facing further harassment, discrimination and retaliation which led to intolerable conditions of employment. No reasonable employee encountering such conditions of employment could come to any other conclusion but that it was time to find a new job.

II.  **A material question of fact exists as to whether Jeffrey Willy was discriminated against based on his sex (gender, gender stereotype, and/or sexual orientation).**

As a preliminary matter, "[g]enerally speaking, there [have been] two ways of proving [a Title VII discrimination] claim: [(1) the 'direct' method of proof[;] and [(2) the 'indirect' method of proof." *Collins v. Amer. Red Cross*, 715 F.3d 994, 999 (7th Cir. 2013). After "a chorus of opinions in the [Seventh Circuit], signed onto by a majority of active judges, that [had] expressed frustration with the confusing 'snarls and knots' of this ossified direct/indirect paradigm," the Seventh Circuit has adopted a more straightforward analysis. *Hitchcock v. Angel Corps, Inc.* 718 F.3d 733, 737 (7th Cir. 2013). The Court in *Ortiz v. Werner Enters., Inc.,* 834 F.3d 760, 765 (7th Cir. 2016) has established the current standard in Title VII discrimination cases on review in summary judgment:

> That legal standard, to repeat what we wrote in *Achor* and many later cases, is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse

employment action. Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself-or whether just the "direct" evidence does so, or the "indirect" evidence. Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled "direct" or "indirect."

"[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81 (1998).

Lilly had a culture of sexist actions. In 2007, shortly after Willy's hiring into Lilly, Stutz told Willy, "He was really happy that I was there, I was a good hire, because the person they'd interviewed before me…. was something to the extent of he was too gay to fit in the lab."[31] Stutz in 2008, recalled finding his son with pornography and said that his son "better not be a fag."[32] In 2009, Tom Baker told Willy that, "I hate fags."[33] Willy recalls his feeling of shock and testified, "And I remember I just kind of looked at him, and then he looked at me and he said, 'Oh, not all fags, just the flamboyant ones.'"[34] In 2010, Willy filled out the Pulse Survey (an employee survey submitted throughout the company focused on senior leadership and the employee's management that Willy believed was to be confidential[35]) and indicated that his division needed to increase diversity and inclusion. Willy also included specific comments in the survey about his then supervisor, Tom Baker.[36]

---

[31] Dkt. 67-3 - Willy Depo. p. 25; line 19 to p. 26; line 2.
[32] Dkt. 67-3 - Willy Depo. p. 38; lines 10-13.
[33] Dkt. 67-3 - Willy Depo. p. 35; lines 14-15.
[34] Dkt. 67-3 - Willy Depo. p. 35; lines 15-18.
[35] Dkt. 67-3 - Willy Depo p. 40: lines 3-5.
[36] Dkt. 67-3 - Willy Depo p. 40; lines 20-25 to p. 41; line 1.

Soon after Willy had a performance management discussion with Baker and the specific comments that Willy made in the Pulse Survey and suggested that he knew Willy was the one who made the comments.[37]

Willy was denied mentorship for not being a woman by the same person who later also complained in a meeting that her daughter thought "it was cool to be gay."[38] At a conference Willy attended on behalf of a Lilly, a male supervisor grabbed Willy's buttocks.[39] In 2017, Stutz approached Willy while he waited for the bathroom attendant to complete the cleaning of the men's restroom and told Willy, "Well, just use the woman's room, if all the weirdo transgender are using whatever restroom they want to the rest of us might as well."[40] Willy was verbally and physically sexually harassed. When Willy would request direction or additional information to complete a project, Stauber told him to role up his sleeves.[41] This statement occurred more than once in conversations with Stauber and Willy.

As set forth in factual detail throughout these brief, in light of all the actions taken against Willy, a reasonable person Willy's sex (gender/gender stereotype/sexual orientation) caused the pervasive and offensive discrimination throughout his time at Lilly up through the constructive discharge.

### III.  __A material question of fact exists as to whether Jeffrey Willy was subjected to a hostile work environment.__

---

[37] Dkt. 67-3 - Willy Depo. p. 43: lines 2-5.
[38] Dkt. 67-3 - Willy Depo. p. 149: lines 2-4.
[39] Dkt. 67-3 - Willy Depo. p. 119; line 25 to p. 121; line 3.
[40] Dkt. 67-3 - Willy Depo. p. 112; line 14 to p. 113; line11.
[41] Dkt. 67-14 - 06June2018_Stauber part ii

"To stave off summary judgment [on a claim of hostile work environment], [Willy] must [provide] sufficient evidence to create a material issue of fact as to four (4) elements: (1) the work environment must have been both subjectively and objectively offensive; (2) his [sex – gender/gender stereotype/sexual orientation –] must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must have been a basis for employer liability." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010) (citation omitted). In its motion for summary judgment, Eli Lilly attempts to portray and downplay the hostile work environment as being secluded to six (6) comments made to Jeffrey Willy over the course of ten (10) years and attempts to have the Court review them in individual aspects rather than looking at the totality of the circumstances. However, Willy's hostile work environment claim is not limited to six (6) comments over the course of ten (10) years, and the Court must look to the totality of the circumstances.

Willy has testified that he found the environment at Eli Lilly to be a very hostile, offensive, aggressive, and toxic work environment establishing the subjective prong.[42] "In determining whether a particular work environment is objectively offensive, [the court] must consider the severity of the conduct, its frequency, whether it is merely offensive as opposed to physically threatening or humiliating, and whether it unreasonably interfered with an employee's work performance." *Swyear v. Fare Foods Corp.,* 911 F.3d 874, 881 (7th Cir. 2018) (citation omitted). In making this determination, the court looks "to the totality of the circumstance and asks

---

[42]Dkt. 67-3 - Willy Depo. 25:10-17; 67:4-16; 119:1-9; 149:1-15; 195:22-25.

whether everything together constitutes a hostile or abusive environment." *Id.;* See *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21-22 (1993) ("[W]e can say that whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances."); *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81 (1998) ("The objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'").

It has been made clear by the United States Supreme Court that it makes no difference if the sex of the harasser is (or is not) the same as the sex of the victim or if a victim is a male or female. *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75 (1998). When looking at the harassment together and in totality, it can be reasonably inferred that Willy's sex – gender, gender stereotype, and/or sexual orientation – were the causes of the harassment. Willy was an exemplary employee at Eli Lilly with a litany of awards and recognitions. No counter positions exist for the cause of Willy's harassment.

In 2019, the Seventh Circuit Court of Appeals provided additional clarity about how "severe" and "pervasive" conduct is. *Gates v. Bd. Of Educ. Of Chi.*, 916 F.3d 631 (7th Cir. 2019) (The Court rejected and reversed the use of the "hellish" standard by the lower court and found that three allegedly offensive remarks made by a supervisor directly to a subordinate over a two-year period would suffice to establish a hostile work environment that could survive summary judgment.) Specifically, the Court held that "[a]lthough Rivera's conduct was relatively infrequent and not "physically threatening" or "humiliating" in a public setting, it was severe and

humiliating[, and] a reasonable jury could also find that it did interfere with Gate's work performance, not least because it led him to take a leave from work to seek medical treatment." *Id.* at 641.

In the case at hand, we have a supervisor engaging in a pattern of aggressive and pervasive behavior in a manner that can be interpreted by a jury as being undertaken to force Willy to leave and "coach" Willy out of Eli Lilly after he had been an exemplary employee for ten (10) years with a litany of awards and recognition; we have performance reviews of Willy being retroactively altered by a supervisor to paint a false narrative of Willy; we have a supervisor of Willy's supervisor directly telling Willy that if he was in his position, he would leave Eli Lilly; we have comments being made over the years that are sexual and offensive; we have a physical assault at a work event of Eli Lilly; we have prior reporting of harassment to supervisors and other employees of Eli Lilly without any investigation by Eli Lilly until Willy directly reports it to HR despite an alleged "zero tolerance" policy; we have a supervisor restricting the growth and advancement of Willy through restricting training and guidance, conference attendance, and lab support; a refusal to provide guidance and training by a supervisor; we have an HR investigation geared towards coaching and protecting the accused; and we have the culminating constructive discharge of Jeffrey Willy.

The designated evidence meets the bar of *Gates* and is akin to *Covington v. Johnson*, 18-cv-1076-JPG-GCS, 2019 U.S. Dist. LEXIS 170193, 2019 WL 4827228 (S.D. Ill. October 1, 2019) (bosses' offensive sexual comments were pervasive enough

that they created an objectively hostile work environment) sufficiently to preclude summary judgment in this matter. Considering the totality of the circumstances, a reasonable jury could find Willy's work environment was objectively hostile, pervasive and severe, caused by his sex, and that it adversely affected his ability to train and progress in his position.

Lastly, "[f]or [Willy] to recover against [Eli Lilly] for the hostile work environment he alleges, he must show a basis for employer liability by proving either (1) that a supervisor participated in the harassment that created the hostile work environment or (2) that [Eli Lilly] was negligent in discovering or remedying harassment by his coworkers." *Montgomery*, 626 F.3d at 390. Under the second prong, Willy "must provide evidence that [Eli Lilly] either 'failed to have and enforce a reasonable policy for preventing harassment.'" *Id.* at 390 (citation omitted). Willy has offered evidence of harassment from supervisors, as well as evidence that Eli Lilly was negligent in discovering remedying harassment by his coworkers by "demonstrate[ing] that he made a concerted effort to inform [Eli Lilly] of the [gender/gender stereotype/sexual orientation] harassment he was allegedly experiencing or that the harassment was sufficiently obvious to put Eli Lilly on constructive notice. *Id.* at 391 (citation omitted). Thus, while only one prong is required, both prongs are met.

IV. **A material question of fact exists as to whether Eli Lilly and Company retaliated against Jeffrey Willy, failed to investigate, and constructively discharged Jeffrey Willy.**

    a. *Jeffrey Willy was Retaliated against by Eli Lilly.*

### i. Jeffrey Willy endured an adverse employment action sufficient to support a claim of retaliation.

The alleged retaliatory conduct is sufficient to support a Title VII retaliation claim and defeat summary judgment. Eli Lilly, in its Def SJ Memo, takes far too narrow of a position as to what can constitute adverse employment actions retaliation claims, and in support cites to a 2001 case, *Stutler v. Ill. Dep't of Corr*, 263 F.3d 698, 703 (7th Cir. 2001), which occurred prior to *Burlington Northern* cited below - suggesting that a "retaliatory harassment can be sufficient to support a retaliation claim *only* when it is severe enough to cause a 'significant change in the plaintiff's employment status.'"

While what constitutes an adverse action in the context of Title VII retaliation had been confusing among Courts of Appeals, in 2006 the United States Supreme Court in *Burlington Northern & Santa Fe Railway Co., v. White*, 126 S. Ct. 2405, 2410-11, 165 L. Ed. 2d 345 (2006) clarified this. As Judge J. Phil Gilbert of the Southern District of Illinois eloquently set forth regarding the holding of *White*:

> While what constitutes an adverse action in the Title VII retaliation context has engendered much confusion among the Courts of Appeals, the Supreme Court has recently clarified the appropriate standard in *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S. Ct. 2405, 2410-11, 165 L. Ed. 2d 345 (2006). In *White*, the Supreme Court held that the adverse action necessary for a retaliation case did not need to affect the terms and conditions of an employee's employment and did not even need to occur at the workplace. *Id.* at 2409, 2414. Instead, it held that a successful Title VII retaliation plaintiff must only establish an "employer action[] that would have been materially adverse to a reasonable employee." *Id.* at 2409. In cases like *White*, actions that are "harmful to the point that they could well dissuade [*41] a reasonable worker from making or supporting a charge of discrimination" would qualify. Id. A similar standard would apply where adverse action is allegedly in retaliation for complaining of sexual harassment.

*Fields v. Ill. Dep't of Corr.,* Case 03-cv-4222-JPG, 2006 U.S. Dist. LEXIS 64968, at

*40-41 (2006). Additionally, the Seventh Circuit in *Freelain v. Vill. of Oak Park*, 888

F.3d 895, 901-902 (7th Cir. 2018) set forth the proper review based on *Burlington*:

> The category of actions prohibited by the statutes' anti-retaliation provisions is broader than the category of adverse employment actions prohibited by the statutes' anti-discrimination provisions. See *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 979 (7th Cir. 2008) (FMLA), citing *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 64, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006) (Title VII's "antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."). This difference makes sense because the provisions banning retaliation create a zone of protection around the fundamental anti-discrimination principle so that employers do not chill worker conduct seeking to vindicate that principle. *Burlington Northern*, 548 U.S. at 63 (anti-discrimination provisions protect people "based on who they are, i.e., their status" while anti-retaliation provision "seeks to prevent harm to individuals based on what they do, i.e., their conduct").

> To count an employer's action as materially adverse, a plaintiff must show [**11] that the action would have "dissuaded a [*902] reasonable worker from" engaging in protected activity. Id. at 68 (citation omitted). This test uses an objective standard, based on how a reasonable employee might react, not the plaintiff's subjective feelings. An employee who is particularly sensitive to an employer's slights receives no greater protection than one who is able to shrug them off. See id.

> Though the inquiry does not reach the personal feelings of individual employees, the inquiry does account for the personal circumstances of those employees. *Washington v. Illinois Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005) ("seeking out devices that would be harmless to most people but do real damage to select targets" can be "materially adverse"). For example, a schedule change "may make little difference to many workers, but may matter enormously to a young mother with school-age children," so the inquiry adjusts accordingly. See *Burlington Northern*, 548 U.S. at 69, citing *Washington*, 420 F.3d at 662. The question is whether a reasonable person in the plaintiff's circumstances would be dissuaded from engaging in protected activity.

In retaliation of Willy's reporting to supervisors and HR, Eli Lilly, Stauber and Baker began excluding Willy from meetings on projects related to injection site reactions and project TANGO.[43] Stauber and Baker excluded Willy from important emails regarding these projects as well. Willy met with McMillian about his concerns of retaliation.[44] During this exchange McMillian informed Willy that during the course of the investigation of Willy's discrimination claim, the issue with potential performance arose.[45] Willy told McMillian that the issue of his performance only arose after he went to HR.[46] McMillian informed Willy that was Willy's view of what was happening.[47] Willy made it clear, That in February he checked in with Stauber to make sure everything was going well and was assured there were no performance issues; not until after he made a formal report with Human Resources did he receive feedback that he was not performing.[48] Willy asked McMillian, "Before the investigation did you receive any information about my performance?"[49] McMillian answered, "I have not asked; that is not my responsibility."[50]

Additionally, Eli Lilly failed to investigate the claim and instead used the purported "investigation" as an opportunity to coach Stauber and her supervisors as to how to properly force Willy out of the company. Stauber stated, "Bernice coached me or indicated that the complaint was in her department and that I should reach

---

[43] Dkt. 67-3 - Willy Depo. p. 177: lines 1-4.
[44] Dkt. 67-11 - Carl (1950) recording.
[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] *Id.*

out to HR or a different arm of employee relations to get advice and coaching on how to approach the performance conversations with Jeff."[51] Individuals from HR coached Stauber and reviewed the content of the mid-year evaluation for Willy.

On January 31, 2017, Willy emailed Stauber: "An associate made an LGBT slur yesterday, to my face. Let's talk when you get a chance." Stauber never reported this to HR and directed Willy to handle it.[52] Willy submitted a complaint of discrimination on March 30, 2018 to Eli Lilly. In June of 2018, Willy reported retaliation to Eli Lilly. On August 24, 2018, Willy informed Lilly that he was resigning effective September 7, 2018 as he felt he had to other option.[53]

In retaliation of Willy's reporting to supervisors and HR, Eli Lilly, we have a supervisor engaging in a pattern of aggressive and pervasive behavior in a manner that can be interpreted by a jury as being undertaken to force Willy to leave and "coach" Willy out of Eli Lilly providing a "not meeting expectation" position in July 2018; we have a supervisor of Willy's supervisor directly telling Willy that if he was in his position, he would leave Eli Lilly; we have a supervisor restricting the growth and advancement of Willy through restricting training and guidance, conference attendance, and lab support; we have a failing HR investigation geared towards coaching and protecting the accused; we have Willy being advised by three (3) different levels of supervisors after the HR complaint that his actions violated "trust;" we have Willy being removed from the TANGO project despite being nominated for

---

[51] Dkt. 67-5 - Stauber Depo. p. 53; lines 1-8.
[52] Dkt. 59 - Def. SJ Memo, p. 5.
[53] Dkt. 67-3 – Willy Depo. p. 192; lines 6-13.

an inspire award by Baker at the same time; and we have the culminating constructive discharge of Jeffrey Willy. The designated evidence supports that a jury could find the actions undertaken by Eli Lilly could dissuade a reasonable person in Willy's circumstances from engaging in the protected activity.

### ii. Jeffrey Willy opposed discrimination in the workplace.

Willy was an exemplary employee who was retaliated against after he informed Eli Lilly, his supervisors, and other Eli Lilly employees, that he was subjected to discrimination, harassment, and a hostile work environment. An employee can bring a retaliation claim based on an earlier complaint that discrimination has occurred. *Burlington Northern & Santa Fe Railway Co. v. White,* 48 U.S. 53 (2006). As the EEOC has noted:

> The opposition clause of Title VII has an "expansive definition," and "great deference" is given to the EEOC's interpretation of opposing conduct.[32] As the Supreme Court stated in *Crawford v. Metropolitan Government of Nashville and Davidson County*, "'[w]hen an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication' virtually always 'constitutes the employee's opposition to the activity.'"[33] For example, accompanying a coworker to the human resources office in order to file an internal EEO complaint,[34] **or complaining to management about discrimination against oneself or coworkers**, likely constitutes protected activity.[35]

EEOC Guidance on Retaliation and Related Issues; see

https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues (last visited 1/31/2021) (footnotes omitted) (emphasis added).

After a June 2016 incident at a professional conference in which Willy was a grabbed on his rear end by a male coworker at an open bar social, who was a superior

level than Willy (R5 versus P4), Willy informed his supervisor, Anja Stauber, Tom Baker, Deb Luffer-Atlas, Brianna Paisley – all Eli Lilly employees – and subsequently HR representatives of the incident. On March 30, 2018, Willy complained about discrimination and harassment against Anja Stauber and other employees to HR. Prior to the HR complaint, Willy had informed superiors above him, and supervisors of his supervisor, of his experience, to no avail. Willy believed what he had endured was inappropriate discrimination and harassment, and when he confronted his supervisor, Anja Stauber's, supervisor, Thomas Jones, on July 24, 2018, after the filing of a HR complaint and asked him what he would do in his situation, the supervisor stated he would leave the company.

Eli Lilly does not actually argue that Willy's actions in reporting what he believed to be offensive, discriminatory activity on behalf of himself was not actually a protected activity, as there is no legal support for such an argument.

### iii. There is a causal connection between Jeffrey Willy's complaint of harassment and discrimination, Eli Lilly's failure to investigate, discrimination and his constructive discharge.

Suspicious timing constitutes circumstantial, or indirect, evidence to support a claim of discrimination. See *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1034 (7th Cir. 1999); see also *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). However, suspicious timing and of itself is rarely enough to prove causation. *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) ("[T]he mere fact that one event preceded another does nothing to prove that the first event caused the

second. Rather, other circumstances must also be present which reasonably suggest that the two events are somehow related to one another.")

However, if a plaintiff can show that the antagonism began after the protected act and was part of an ongoing pattern of antagonistic behavior, the antagonism provides evidence of retaliation. *Carlson v. CSX Transportation, Inc.*, 758 F.3d 819, 829 (7th Cir. 2014) citing *Warren v. Prejean*, 301 F.3d 893, 900 (8th Cir.2002) (affirming jury verdict for plaintiff on retaliation claim because, despite over four-year gap between grievance and termination, termination "was the end result of an ongoing pattern of retaliatory behavior"); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920-21 (3d Cir.1997) (affirming jury verdict for plaintiff on retaliation claim because "a plaintiff can establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period," even if the intervening period spanned years).

Here, we have the "other circumstances" and the kind of ongoing pattern of antagonism which would indicate that Willy was subjected to retaliatory behavior which led to materially adverse employment actions that would dissuade a reasonable worker from making or supporting a charge of discrimination. Consider: Willy was an exemplary employee. Willy had been repeatedly promoted at Eli Lilly, and was said to have been on the "fast track." When he went to his new employment position in California, he continued his exemplary work and was even still a co-author on a research paper he had started while at Eli Lilly.

Conditions at Eli Lilly started to go downhill even further, especially with his supervisor, once Willy made the report of harassment and discrimination, ultimately leading to material employment actions. This is enough, alone, to find a causal connection between Willy's complaint regarding the discrimination and harassment, and his constructive discharge. There is additional evidence to support the claim that there is a causal connection between his complaint and the retaliation that led to his constructive discharge, however. Supervisors were aware of past harassment, both mental and physical, over the years at Eli Lilly involving Willy, and Eli Lilly purports to have a "zero tolerance" policy. So, if that was the case, it begs the question: why did Eli Lilly wait to begin an investigation until Willy complained to HR?

## Conclusion

Ultimately, it is the movant for summary judgment under Fed.R.Civ.P. 56 who bears the burden of proving both the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Therefore, Plaintiffs pray that this Court deny the Defendants' Motion for Summary Judgment as there are numerous material questions of fact which can only be resolved by a jury after first assessing the veracity of the evidence, the credibility of witnesses, the level of Defendants' culpability, and determining the appropriate inferences to be drawn from the evidence.

**Wherefore** Plaintiff, Jeffrey A. Willy, by counsel, respectfully requests the court deny Defendant, Eli Lilly and Company's Motion for Summary Judgment, and for all other relief found just and proper in the premises.

Date: <u>February 2, 2021</u>

Respectfully submitted,

WALDRON TATE BOWEN
FUNK SPANDAU LLC

<u>/s/ Brandon E. Tate</u>
Brandon E. Tate, Atty. No. 31531-49
156 E Market St, 5th Floor
Indianapolis, IN 46204
317.296.5294
Fax: 317.423.0772
brandon@wtbfs-law.com

Tarah M.C. Baldwin, Atty. No. 32317-49
BALDWIN LEGAL GROUP LLC
8500 Keystone Crossing, Ste. 470
Indianapolis, IN 46240
Phone: 317-871-1948
tarah@baldwinlegal.llc

*Counsels for Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 2, 2021, a copy of the foregoing was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

<u>/s/ Brandon E. Tate</u>
Brandon E. Tate, Atty. No. 31531-49