UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| JEFFREY A. WILLY, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | No. 1:18-cv-03934-RLY-DML |
|  | ) |  |
| ELI LILLY AND COMPANY, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Jeffrey Willy, Plaintiff, worked for Eli Lilly, Defendant, for more than a decade. During that time, he received numerous promotions and awards, and he even earned two graduate degrees at Lilly's expense. But Willy's employment with Lilly was not without issues. Willy, who is gay, alleges his supervisors and coworkers subjected him to a hostile work environment and discriminated against him based on sex and sexual orientation. When Willy spoke up about this mistreatment, he claims Lilly failed to investigate the misconduct and retaliated against him. This all lead to Willy's constructive discharge from Lilly. So Willy filed the present lawsuit, alleging various violations of Title VII. Lilly now moves for summary judgment. For the reasons that follow, Lilly's motion is **GRANTED**.

I.  **Factual Background**

   A.  **Willy's Employment at Lilly**

Lilly hired Willy as a contractor in the fall of 2006. (Filing Nos. 58-2 and 67-3, Deposition of Jeffrey Willy ("Willy Dep.") at 15-16). In that position, Willy reported

1

directly to Thomas Baker. (*Id.* at 24). Willy had already begun pursuing a master's degree when he was hired, but, with Baker's approval, Lilly agreed to reimburse Willy for his tuition. (*Id.* at 71-72). Lilly hired Willy as a full-time P1 Toxicologist in 2009.[1] (Willy Dep. at 62-63). In mid-2012, at Baker's recommendation, Lilly promoted Willy to a P2 Associate Toxicologist. (*Id*. at 76-77, 81). During the summer of 2012, Willy went back to school to obtain his Ph.D. while continuing to work for Lilly. (*Id.* at 80). Lilly again reimbursed Willy for his tuition. (*Id.*).

In 2016, Willy received a double promotion, from P2 to P4. (Filing No. 58-4, Declaration of Anja Stauber ("Stauber Decl.") ¶ 6). A double promotion within the P path is rare, but both Baker and Baker's supervisor, Anja Stauber, Director of Toxicology/Pathology, supported the decision. (*Id.* ¶¶ 4-6). Willy completed his Ph.D. in June of 2016. (Willy Dep. at 96). Later that year, Stauber again recommended Willy for a promotion from P4 to R1. (Stauber Decl. ¶ 7). R path positions are senior-level scientific jobs, and R path scientists are responsible for leading projects, developing their own research consistent with business objectives, and sometimes managing their own labs. (*Id.* ¶ 3). They may or may not have direct reports. (*Id.*). Willy was promoted to R1 on October 1, 2016 and began reporting directly to Stauber. (*Id.* ¶ 7).

After his promotion, Willy shared a lab space with other R path scientists in his department and he received staff support, including one direct report and one shared contractor. (Stauber Decl. ¶ 8). Stauber explained that she did not have enough funding

---

[1] "P" stands for Professional and is the name of one of Lilly's salary paths. (Filing No. 58-4, Declaration of Anja Stauber ("Stauber Decl.") ¶ 3). The P path runs P1 through P4. (*Id.*)

to give Willy additional staff support. (*Id.*). The other two scientists in the lab, Tom Baker, who had been Willy's supervisor before Willy's promotion, and Laurent Malherbe, had more direct reports than Willy, but they had both been lab leaders for more than a decade and had developed tools and capabilities to support the department. (*Id.* ¶ 10; Filing No. 58-6, Deposition of Anja Stauber ("Stauber Dep.") at 24-25, 67-68).

B.  **Willy's Performance**

Willy received almost two dozen awards during his time at Lilly. (Filing No. 13, Answer ¶ 22). But Willy began struggling to meet his work expectations in 2017, including having difficulty with his focus, understanding the bigger picture, and with delivering results. (Stauber Dep. at 63). At the end of 2017, Stauber spoke with Willy about feedback she had received from cross-functional colleagues about his inability to meet commitments, and these issues continued into 2018. (*Id.* at 35-36). Stauber noted these issues in Willy's performance file. (*Id.* at 36, 63). Despite these performance issues, Stauber still rated Willy as meeting expectations. (Filing Nos. 58-3 and 67-4, Willy Dep. Ex. 12 at 3). Stauber continued to have performance conversations with Willy into 2018. (Stauber Dep. at 35-36; 97).

On July 5, 2018, Stauber met with Willy to discuss his performance in advance of the midyear check-in. (*Id.* at 53). She informed Willy that his performance was trending toward not meeting expectations. (*Id.* at 54). According to Stauber, Willy resisted feedback and failed to improve his performance. (Stauber Decl. ¶ 13). Rather than discipline Willy and place him on a performance improvement plan, Stauber opted to continue coaching and providing feedback to him. (*Id.*).

## C. Offensive Language and Inappropriate Conduct

Willy identified several instances of offensive language and inappropriate behavior by Lilly employees over the course of his employment. In 2007, John Stutz, a technician, told Willy that he was a good hire because another applicant for Willy's position was "too gay for the lab and wouldn't fit in," (Willy Dep. Ex. 1 at 1). In 2008, after Stutz found gay pornography in his son's desk, Stutz said, "my son better not be a fag." (*Id.*). One day in 2009, as Willy and Tom Baker, Willy's supervisor at the time, were walking in from lunch, Baker said, "I hate fags," which Willy described as "one of those phrases that will stick with you forever." (Willy Dep. at 35). When Willy looked at him, Baker looked back at him and said, "Oh, not all fags, just the flamboyant ones." (*Id.*). Sometime after Baker made this comment, Willy reported the incident to Baker's supervisor, Tracy Williams. (*Id.* at 31). Williams said Willy should speak to Baker directly, although Willy did not do so. (*Id.* at 39). Willy also filled out an online survey, which Willy thought would be anonymous, and said Lilly could do a better job of increasing diversity and inclusion among its employees. (*Id.* at 41, 43, 48). Willy believes Baker was able to determine that this comment came from Willy and that it was directed at Baker. (*Id.* at 40-41).

In 2017, Stutz said that Willy should use the women's restroom because "if all the weirdo transgender[s] are using whatever restroom they want[,] the rest of us might as well," (Willy Dep. Ex. 1 at 2). After this incident, Willy emailed Stauber: "An associate made an LGBT slur yesterday, to my face. Let's talk when you get a chance." (Willy Dep. at 111; Willy Dep. Ex. 11). Stauber responded quickly and Willy stopped by her

4

office. (Willy Dep. at 111-12). According to Willy, he told Stauber that, while he was waiting to use the restroom, John Stutz, a technician who reported to Willy's peer, said, "Well, just use the women's restroom. That's what all the weirdo transgenders are doing these days, or something to that extent." (*Id.* at 112-113). Willy claims that Stauber responded, "Well, you're an R1 scientist now, you're in a management role, I want you to handle this." (*Id.* at 113). Willy did not approach Stutz about the comment. (*Id.* at 115).

Two other comments were made by Senior Research Fellow Deborah Luffer Atlas, both in 2017. After Willy asked Atlas to be his mentor, Atlas responded that she only mentors women. (Willy Dep. Ex. 1 at 2). In a group meeting that year, Atlas spoke about how her "kids pretend to be gay because it is cool," "trendy," and "it's the thing to do" these days. (*Id.* at 3). When Willy spoke up and explained that many kids may be struggling to come out and that people need to respect those that are going through that process, Atlas rolled her eyes and said, "whatever." (*Id.*).

There was also at least one incident of physical harassment. At a research conference in 2016, Dave Watson, a Lilly employee, placed his hand on Willy's buttocks. (*Id.* at 120-21). Watson later began sending inappropriate emails containing sexual innuendos to Willy on their work emails. (*Id.* at 121).

**D.     HR Complaint and Investigation**

On March 30, 2018, Willy reported his concerns to Lilly's HR. (Filing No. 58-1, Declaration of Bernice Anthony ("Anthony Decl.") ¶ 6)). Lilly directed Bernice Anthony to investigate the claims. (*Id.* ¶¶ 6-7; Filing No. 58-7, Anthony Decl. Exs. C, D). Anthony concluded that Stauber had not violated Lilly's Conduct in the Workplace

5

policy, and she notified Willy of this finding on June 1, 2018. (Anthony Decl. Ex. D at 10). Anthony continued her investigation into the allegations against other Lilly employees. (*Id.* at 14-26). Ultimately, Anthony and Pankaj Chaudhary, Director of Global Investigations COE, met with Willy on August 7, 2018 and informed him that the results of the investigation did not support Willy's allegation. (*Id.* at 26). Anthony provided Willy with a Closure of Investigation Memo and encouraged him to contact HR with additional concerns. (Willy Dep. at 189-90; Willy Dep. Ex. 13).

### E. Willy Leaves Lilly and Files a Charge of Discrimination

On July 6, 2018, Willy accepted a job with another company in San Diego. (Willy Dep. at 236). Willy then filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on July 25, 2018. (Anthony Decl. ¶ 9). Willy notified Lilly on August 24, 2018 that he was resigning effective September 7, 2018. (Willy Dep. at 192). Lilly did not receive notice of the EEOC Charge until after Willy's resignation. (Anthony Decl. Ex. F).

## II. Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Gates v. Bd. of Educ. of the City of Chicago*, 916 F.3d 631, 635-36 (7th Cir. 2019) (quoting Fed. R. Civ. P. 56(a)). The court reviews all facts, and draws all reasonable inferences from those facts, in favor of the nonmoving party. *Id.* at 636. Once the moving party identifies portions of the record which "demonstrate the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986),

6

the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matasushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must set forth specific facts that demonstrate a genuine issue for trial. *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018). To that end, the nonmoving party must "'cit[e] to *particular parts* of materials in the record' in order to show that there is a genuine dispute of fact between the parties on a relevant point." *Packer v. Trustees of Indiana Univ. Sch. of Med.*, 800 F.3d 843, 848 (7th Cir. 2015) (emphasis in *Packer*).

## III. Discussion

Willy's claims all arise from Title VII. First, Willy alleges Lilly subjected him to a hostile work environment. Willy also alleges he was discriminated against on the basis of gender, gender stereotype, and sexual orientation. Finally, Willy claims Lilly failed to investigate his complaints, retaliated against him, and constructively discharged him.

Before addressing these claims, the court notes several issues with Willy's brief. It contains only sporadic and incomplete citations to the record. For example, much of his argument relies on several lengthy audio recordings surreptitiously created during meetings with Willy's supervisors. (Filing Nos. 67-1, 67-2, 67-8, 67-9, 67-11, and 67-14). However, Willy fails to direct the court to specific portions of the audio records. The nonmoving party must point to particular portions of the record to demonstrate the existence of a material dispute. *See* S.D. Ind. L.R. 56-1(e) (explaining that "each fact" asserted in a brief must be supported by a "specif[ic]" citation to the record). The court is under no duty to "scour the record" for evidence to oppose a summary judgment motion.

7

*Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). In fact, Willy makes a concession that appears to give the game away. He argues that "[w]hile it is true that [he] will have to provide evidence *at trial* from which a reasonable jury could conclude that he was discriminated against, harassed, and retaliated against, the [sic] Eli Lilly does not meet its burden at summary judgment by presenting a bald statement on its potential liability and asking that the court believe it." (Filing No. 68, Willy's Resp. Br. at 9) (emphasis added). Summary judgment is the "'put up or shut up moment' in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Accordingly, the court will not consider assertions that are not adequately supported with citations to the record. *See* S.D. Ind. L.R. 56-1(h).

### A. Hostile Work Environment

Willy claims he was subjected to a hostile work environment because of his sex. To succeed on this claim, Willy must show: "(1) he was subject to unwelcome harassment; (2) the harassment was based on [sex]; (3) the harassment was severe or pervasive to a degree that altered the conditions of employment and created a hostile or abusive work environment; and (4) there is a basis for employer liability." *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018).[2] Courts "will not find a hostile work

---

[2] The test is sometimes phrased differently, with courts "looking instead for evidence that the workplace was both subjectively and objectively offensive—either in lieu of the first prong—that the employee was subject to unwelcome harassment—or the third prong —whether the harassment was severe or pervasive enough to rise to the level of a hostile work environment." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018). Under either version, the inquiry is the same. *Id.*

environment for mere offensive conduct that is isolated, does not interfere with the plaintiff's work performance, and is not physically threatening or humiliating." *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011). *See also Passananti v. Cook Cty.*, 689 F.3d 655, 667 (7th Cir. 2012) ("Offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment.").

"To be severe or pervasive enough to create a hostile work environment, conduct must be "extreme.'" *Equal Emp. Opportunity Comm'n v. Costco Wholesale Corp.*, 903 F.3d 618, 625 (7th Cir. 2018) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)). Determining whether conduct is severe or pervasive is not subject to "a mathematically precise test." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993). Rather, it depends on "the severity of the alleged conduct, its frequency, whether it is physically threatening or humiliating (or merely offensive), and whether it unreasonably interferes with the employee's work performance." *Robinson*, 894 F.3d at 828. Courts draw an important distinction between offensive comments made by coworkers and those made by a plaintiff's supervisor—the latter carrying far more weight in a hostile work environment claim. *See Gates v*, 916 F.3d at 638 (collecting cases). There is also an important difference between comments directed at the plaintiff and those made in the plaintiff's presence or in other indirect means. *Id.*

Willy bases his hostile work environment claim on a combination of comments and actions by his supervisors and others. Several of the comments were allegedly made by a single coworker, John Stutz, a technician: (1) in 2007, Stutz said that another

9

applicant for Willy's position was "too gay for the lab and wouldn't fit in," (Willy Dep. Ex. 1 at 1); (2) in 2008, after Stutz found gay pornography in his son's desk, Stutz said, "my son better not be a fag," (*id.*); and (3) in 2017, Stutz said that Willy should use the women's restroom because "if all the weirdo transgender[s] are using whatever restroom they want[,] the rest of us might as well," (*id.* at 2). Two other comments were made by Senior Research Fellow Deborah Luffer Atlas, both in 2017. After Willy asked Atlas to be his mentor, Atlas responded that she only mentors women. (Willy Dep. Ex. 1 at 2). In a group meeting that year, Atlas spoke about how her "kids pretend to be gay because it is cool", "trendy", and "it's the thing to do" these days. (*Id.* at 3). When Willy spoke up and explained that many kids may be struggling to come out and that people need to respect those that are going through that process, Atlas rolled her eyes and said, "whatever." (*Id.*).

The offensive language did not just come from coworkers. One day in 2009, Tom Baker, Willy's supervisor at the time, said, "I hate fags." (Willy Dep. at 30, 35). When Willy looked at him, Baker looked back and said, "Oh, not all fags, just the flamboyant ones." (*Id.*).

Willy also recounts one incident of physical sexual harassment. At a research conference in 2016, a Lilly employee placed his hand on Willy's buttocks. (*Id.* at 120-21). Watson later began sending inappropriate emails containing sexual innuendos to Willy on their work emails. (*Id.* at 121).

These comments, while certainly offensive and inappropriate in any setting, do not create a hostile work environment. Six comments, none of which were directed at Willy,

and one incident of physical sexual harassment over the span of a decade, are too sporadic and isolated to establish liability. *Compare Poullard v. McDonald*, 829 F.3d 844, 858 (7th Cir. 2016) (three "race-tinged" remarks by a supervisor over a fourteen month period was not severe and pervasive.); *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (eight comments by surgery department chief over seven years was not severe or pervasive); *Adusumilli v. City of Chicago*, 164 F.3d 353, 361-62 (7th Cir. 1998) (coworker did not severely or pervasively harass plaintiff by making sexual comments and touching her arm, fingers, or buttocks on four occasions); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995) (plaintiff's supervisor making masturbation gestures while conversing with her, grunting suggestively as she turned to leave his office, referring to her as a "pretty girl," and commenting that his office did not get "hot" until she walked in was not severe or pervasive); *with Costco Wholesale Corp.*, 903 F.3d 618, 626 (7th Cir. 2018) (a jury could conclude a customer's "constant[]" efforts to talk to plaintiff at work, "stalking" and filming plaintiff at work, touching her twice, unsuccessfully trying to hug her twice, and bumping her with his cart four times over thirteen months was severe or pervasive); *Johnson*, 892 F.3d at 903–04 (finding a jury question when supervisors "routinely" harassed plaintiffs by mocking the speech of Black employees, directly calling plaintiffs the N-word, "black wig-wearing witches", "a black B. Bipolar. Crazy.", and telling a plaintiff she had a "black girl ghetto attitude"); *Gates*, 916 F.3d at 641 (finding a jury question whether supervisor calling plaintiff the N-word twice and threatening to write up his "black ass" is severe or pervasive).

11

Even the comment by Baker, Willy's supervisor, that he "hates fags" is not severe enough to establish a hostile work environment.[3] *See Robinson*, 894 F.3d at 828 (noting that the severe or pervasive requirement "may be met by a single extremely serious act of harassment or by a series of less severe acts"). The court does not mean to diminish the hurtful impact this incident had on Willy, but the single instances that established liability in other cases are more egregious, such as assault in the workplace. *See e.g., Yancick*, 653 F.3d at 547 (purposefully dropping a steel coil on a co-worker qualifies as egregious conduct); *Lapka v. Chertoff*, 517 F.3d 974, 983 (7th Cir. 2008) (plaintiff raped by coworker). And a single comment by a supervisor over a ten year period is certainly not pervasive.

Beyond the comments and physical harassment, Willy also cites what he describes as a "pattern of aggressive and pervasive behavior" designed to push Willy out of the company. (Willy's Resp. Br. at 26). He complains that meetings with Anja Stauber, his supervisor, grew increasingly hostile after he submitted his HR complaint. But none of the comments from those meetings, which he recorded, are objectively insulting or harassing, and he does not indicate that anything in those meetings was based on his sex or sexual orientation.

The court concludes Willy has not presented sufficient evidence upon which a reasonable jury could conclude that the harassment was severe or pervasive. Accordingly, his hostile work environment fails as a matter of law.

---

[3] It is unclear from the record whether Baker knew Willy was gay at the time he made the comment. But even assuming he knew, it does not change the result.

B.     **Discrimination on the Basis of Sex**

Willy claims he was discriminated against on the basis of his sex.[4] The single question courts ask when evaluating a discrimination claim is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [sex] caused the discharge or other adverse employment action.'" *Johnson*, 892 F.3d at 894 (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764-66 (7th Cir. 2016)). Within this inquiry, the familiar burden-shifting approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), is still available and is an efficient way to organize and assess the evidence. *Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 629 (7th Cir. 2018); *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). Under this approach, Willy can avoid summary judgment by showing: (1) he is a member of a protected class; (2) he was satisfying Lilly's expectations; (3) he suffered an adverse employment action; and (4) similarly situated individuals outside his protected class received better treatment. *Barbera*, 906 F.3d at 629. If Willy makes this *prima facie* showing, the burden shifts to Lilly to present a legitimate, non-discriminatory reason for the challenged action. *Id.* If Lilly carries this burden, then then the burden shifts back to Willy to show pretext. *Id.*

Lining up all the evidence identified by Willy, a reasonable jury could not conclude that Willy was discriminated against on the basis of sex. First, Willy claims his lab space and support were inferior to that of other scientists at Lilly. But the

---

[4] Willy brings separate claims of discrimination on the basis of gender, gender stereotype, and sexual orientation. The court understands these to be different ways of articulating a claim of sex discrimination. *See Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1732, 1743 (2020).

comparators he identifies were not similarly situated. *See Raymond Ameritech Corp.*, 442 F.3d 600, 611 (7th Cir. 2006) ("Employees are similarly situated if they are directly comparable in all material respects."). Willy shared the same lab space with other R path scientists, and he claims they were working on many of the same projects with similar tasks. (Willy Dep. at 103). Willy had one direct report and one shared contractor. (Stauber Decl. ¶ 8). While two other scientists in Willy's lab had more direct reports than Willy, they had both been lab leaders for more than a decade, had developed tools and capabilities to support the department, and had delivered larger strategies and business plans. (Stauber Decl. ¶¶ 8, 10; Stauber Dep. 67-68). Stauber also explained that she did not have enough resources to give Willy additional staff support. (Stauber Decl. ¶ 8). These significant differences are sufficient to show that these comparators were not similarly situated. *See Poullard*, 829 F.3d 844, 855 (7th Cir. 2016) (courts consider whether the employees in question had the same job description, were subject to the same standards, had the same supervisor, and had comparable experience, education, and other qualifications.).

Willy has also not shown that Lilly's explanation was a pretext for unlawful discrimination. The question here "is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it was offered" for the challenged action. *Liu v. Cook Cty.*, 817 F.3d 307, 316 (7th Cir. 2016). In other words, "[T]he only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011). Lilly pointed to a lack of resources for additional staff support and

14

the difference in experience, capabilities, and deliverables to explain the difference in lab size. Willy has not pointed to any evidence that these reasons were a lie.

Willy also makes vague reference to his supervisor's decision to discourage him from attending various work conferences. Stauber explained that she recommended Willy not attend certain conferences because he had already attended several conferences, and she wanted him to focus on his own internal lab work and completing his work requirements. (Stauber Dep. at 59-60). Not only has Willy failed to identify any comparator, but he has again failed to show that Stauber's explanation was pretextual.

Finally, Willy also relies on the same offensive comments and incidents described in the hostile work environment section, but Willy has not shown that any of those incidents amounted to an adverse employment action.

Because the evidence does not show that Willy was discriminated against on the basis of sex, summary judgment on this claim is appropriate.

### C. Retaliation

Turning to Willy's retaliation claim, he alleges Lilly retaliated against him for filing his HR complaint in 2018. Title VII prohibits an employer from discriminating against an employee who complains about discrimination. *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009); 42. U.S.C. § 2000e-3(a). To make out a claim of retaliation, Willy must show: (1) he engaged in a statutorily protected activity; (2) his employer took a materially adverse action against him; and (3) there is a causal link between the protected activity and the adverse action. *Robinson v. Perales*, 894 F.3d 818, 830 (7th Cir. 2018). A materially adverse action is one that might have dissuaded a

reasonable employee from engaging in the protected activity. *Id.* To prove causation, Willy, must show that "the desire to retaliate was the but-for cause of the challenged employment action." *Id.* (quoting *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1019 (7th Cir. 2016)). *See also Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 959 (7th Cir. 2021) ("As with discrimination claims, the question for a retaliation claim should always be: 'Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge?'").

Willy has not presented adequate evidence to establish a causal link between filing the HR complaint and any of the complained of conduct. Suspicious timing alone is rarely enough to create a triable issue. *Igasaki*, 988 F.3d at 959. For the court to infer causation based on suspicious timing, courts typically allow "no more than a few days to elapse" between the protected activity and the challenged action. *Id.* (two-month gap between protected activities and termination cannot show retaliation on its own.).

Willy argues there is other evidence from which a fact finder can infer a causal link, but none of that evidence allows such a leap. First, Willy alleges that after he filed his complaint with HR in March 2018, his supervisors excluded him from meetings about projects he was working on and left him off relevant emails. But Willy does not offer any evidence that his alleged exclusion from meetings and emails was in any way related to his HR complaint. The court cannot simply infer a retaliatory animus behind his exclusion from certain meetings and emails because they occurred after he filed his complaint.

Willy also alleges that Lilly failed to investigate his complaint and instead used the investigation as an opportunity to "coach" Stauber and her supervisor on how to push Willy out to the company. Willy offers no evidence to support this allegation. Stauber testified that HR did "coach" her on how to approach conversations with Willy about his performance, but that does not support an inference that it was in any way designed to push Willy out of the company. (Stauber Dep. at 65-66). Moreover, the allegation that Lilly failed to investigate his complaint is incorrect. After Willy filed his complaint in March 2018, Lilly directed Bernice Anthony to investigate the claims. (Anthony Decl. ¶¶ 6-7; Anthony Decl. Exs. C, D). During the course of her investigation, Anthony interviewed Willy, Baker, and Stauber's supervisor, Thomas Jones. (Anthony Decl. Ex. D). Ultimately, Anthony concluded that Stauber had not violated Lilly's Conduct in the Workplace policy, and she notified Willy of this finding on June 1, 2018. (Anthony Decl. Ex. D at 10). Anthony continued her investigation into the allegations against other Lilly employees, and she met with Willy, Stauber, Jones, Stutz, and Atlas. (*Id.* at 14-26). On August 7, 2018, Anthony and Pankaj Chaudhary, Director of Global Investigations COE, met with Willy and informed him that the results of the investigation did not support Willy's allegation. (*Id.* at 26). Anthony provided Willy with a Closure of Investigation Memo and encouraged him to contact HR with additional concerns. (Willy Dep. at 189-90; Willy Dep. Ex. 13). In sum, Lilly investigated Willy's concerns and found no violation.

Next, Willy claims he only began to receive negative performance reviews after he filed his complaint. But that is also incorrect. Stauber did inform Willy in July 2018 that

his work was trending toward not meeting expectations, but she began discussing the expectations for his work and his performance as early as 2016. (Stauber Dep. at 35, 61-62). According to Stauber, Willy began not meeting expectations in 2017. (*Id.* at 63). He struggled with his focus, understanding the bigger picture, and with delivery. (*Id.*). At the end of 2017, Stauber spoke with Willy about feedback she had received from cross-functional colleagues about his inability to meet commitments, and these issues continued into 2018. (*Id.* at 35-36). Stauber noted these issues in Willy's performance file. (*Id.* at 36, 63). Willy's performance issues were well-documented and predated his HR complaint, so this does not help Willy's case.

In sum, no reasonable jury could conclude that Lilly retaliated against Willy.

### D. Constructive Discharge

Finally, Willy claims his working conditions became so intolerable that he was constructively discharged. An employee is constructively discharged when, from the perspective of a reasonable employee, the working conditions are so unbearable that he is forced to resign. *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). To make out a constructive discharge claim, Willy must "show working conditions even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress[.]" *Id.*

None of the complained of conduct rises to the level of constructive discharge. The court has already discussed the offensive comments and incidents and concluded they did not create a hostile work environment, let alone create conditions even more egregious which would support a claim of constructive discharge. Beyond those

incidents, Willy points to (1) a July 5, 2018 meeting with Stauber; (2) a July 10, 2018 meeting with Stauber; (3) a July 10, 2018 conversation with Thomas Jones, Stauber's supervisor; (4) a conversation with Jones' supervisor, Carl McMillian; and (5) a lack or responsiveness from HR during this period. The problem is Willy accepted a job with another company on July 6, 2018, before all but one of those events. (Willy Dep. at 236-37). Events that occurred after he accepted another position could not have caused his resignation or constructive discharge. But even considering these events, Willy does not point to anything so egregious as to lead a reasonable employee to resign.

**IV.    Conclusion**

For the foregoing reasons, Defendant's Motion for Summary Judgment (Filing No. 59) is **GRANTED.**

**SO ORDERED** this 26th day of July 2021.

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.